**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**MANHATTAN DIVISION**

PETER CASTANEDA and HALEY GELFAND, on behalf of themselves and all others similarly situated,

*Plaintiffs*,

v.

COMPASS, INC. D/B/A COMPASS INTERNATIONAL HOLDINGS,

*Defendant*.

Case No.

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff PETER CASTANEDA and HALEY GELFAND ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following Class Action Complaint (the "Action") against the above-captioned Defendant, COMPASS, INC. D/B/A COMPASS INTERNATIONAL HOLDINGS ("Compass" or "Defendant"), upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of their counsel as follows:

## I. INTRODUCTION

1. Plaintiffs Castaneda and Gelfand bring this Action against Defendant Compass, Inc. d/b/a Compass to seek redress under the federal and state antitrust laws on behalf of themselves and a class of all persons in the New York City-metro area (the "geographic market") who have leased non-rent stabilized, multifamily residential real estate units (or, "rental units") from August 1, 2026 through the present (the "Class Period").

2. Compass created a trust and has attempted to monopolize or actually did monopolize the market for rental units in the geographic market (the "Relevant Market") as a result of its acquisition of some its largest competitors. From the halls of Congress to courtrooms across the country, Compass' conquest to seize control over various housing markets has drawn consternation, scrutiny, and litigation in a challenging attempt to quell the impending crisis caused by Compass. That crisis has now come to pass.

3. Compass, which now owns every other competitor real estate brokerage firm listed in *footnote 2*, controls over 80% of the rental unit listings available for renters in Manhattan based on 2025 data.[1] Rather than compete in the Relevant Market on the merits to attain high profits,

[1] Jake Indursky & Sheridan Wall, "*Compass taps NYC agents to remove listings from StreetEasy*," (THEREALDEAL) (ONLINE) (Updated Aug. 7, 2026) at https://therealdeal.com/new-york/2026/08/06/compass-taps-nyc-agents-to-remove-listings-from-streeteasy/.

Compass instead neutralized competitors by acquiring them.[2] Then it turned its sights on renters, including Plaintiffs Castaneda and Gelfand and Class members, to extract as much as it could from them through its control of the Relevant Market.

4. Compass has done this not just through its acquisition of nearly all of its competitors, but also through the manipulation of renters' access to available listings of rental units through digital platforms.

5. Indeed, in addition to Compass' campaign to have no competitors, much of the harm emanating from Compass' conduct is tied to the publication of listings of rental units for prospective renters. Compass, led by its chief executive Robert Reffkin, has been engaged in both a litigative and public relations-based war with Zillow – the top free digital platform which endeavors to list every single available unit for rent or sale across the United States. In the geographic market, Zillow operates through a subsidiary called StreetEasy, which provides prospective renters and homebuyers with access to New York City properties through a website and mobile application. For years, the innovative concept of having all rental units for prospective renters in one place has led to Zillow's StreetEasy platform having between a 70-80% market share

[2] In January of 2026, Defendant Compass acquired Anywhere Real Estate for $1.6 billion, creating the largest real estate brokerage in the world.

*See*, https://www.floridarealtors.org/news-media/news-articles/2026/01/compass-completes-16b-anywhere-acquisition, (last accessed Aug. 19, 2026).

These affiliates and brokerages now include: Anywhere Integrated Services LLC, Anywhere Advisors LLC, Anywhere Leads Inc., Better Homes & Gardens Real Estate LLC, Century 21 Real Estate LLC, Coldwell Banker Real Estate LLC, ERA Real Estate LLC, Corcoran Group LLC, Compass Inc. d/b/a Compass, and Sotheby's International Realty Affiliates LLC.

*See, https://privacy.anywhere.re/global-privacy-notice/*, (last accessed Aug. 19, 2026).

in the Relevant Market for the provision of available listings.[3] To be clear, StreetEasy does not function as a brokerage – rather, it makes available brokerages' listings for rental units through a platform which allows prospective renters easy access to those brokerages themselves: StreetEasy functions as the host for prospective renters to find rental units, while brokerages provide those rental units themselves.

6. In Compass' second quarter earnings call in August of 2026, Reffkin was asked about his desire to compete with Zillow (and, therefore, StreetEasy), to which he responded "[i]s it unreasonable to expect that the company that has the most listings in the United States is the number one place people search in the United States? I don't think so."[4] Reffkin claimed that, by the end of the third quarter, "80% of listings from Compass" will be listed as coming soon on Compass' own website and on a competitor digital platform to Zillow called Redfin.[5] The benefit to Compass has already been substantial, with an increase of 111% of daily visitors to Compass' own website as compared to 2025.[6] All of this is consistent with Compass' "Fall Marketing Playbook" which "involves hiding listings from the public" in an attempt to "enable its own agents to double-dip to increase revenue per transaction, boost its stock price and effectively ignore the

---

[3] Kathryn Lindsay, "'*Amazon for real estate': how the StreetEasy app took over New York*," THE GUARDIAN (ONLINE) (Feb. 9, 2022), at https://www.theguardian.com/lifeandstyle/2022/feb/09/streeteasy-new-york-housing-rental.

[4] Jake Indursky, "*'People will search where the inventory is': Robert Reffkin lays out Compass' portal ambitions*," THE REAL DEAL (ONLINE) (Aug. 5, 2026), at https://therealdeal.com/national/2026/08/05/compass-ceo-robert-reffkin-lays-out-portal-ambitions/.

[5] *Id.*

[6] *Id.*

consumer."[7] In what The Real Deal, the leading real estate news industry publication, calls an "antitrust red flag," the recap of Compass' conduct was explained as follows:

> On July 22, at two meetings held at Extell's Central Park Tower, [Compass] CEO Robert Reffkin and other brokerage heads told top NYC agents to temporarily pull their listings off StreetEasy starting in August. A follow-up email spelled out a "playbook" whose first step was literally "delist your listings from StreetEasy," followed by re-routing the listing through REBNY's Residential Listing Service using the "Participant's Only" designation. This status shares the listing with other agents in the RLS network but keeps it off public-facing sites entirely. When asked about it, a Compass spokesperson characterized the meetings simply as a discussion of strategies for the fall market, a notably bland description for a directive whose first line is "delist."[8]

7. There are numerous problems with this for renters in the Relevant Market.

8. *First*, StreetEasy is a free-to-use platform with access to brokers who do not charge a brokers' fee, whereas access to Compass' listings requires a registration by renters in addition to only having access to brokers' fee units. The rerouting of Compass' listings through REBNY's Residential Listing Service ("RLS") intentionally results in depriving consumers of free-to-access portals to find rental units and instead mandates the use of a broker (which necessitates broker fees) to find a rental unit. *Second*, Compass has the ability to distort the market for rental units in the Relevant Market. The reason for this is its monopoly power over 80% of the listings in Manhattan alone, for example. With control over those listings, choosing to delist them from free-to-use platforms like StreetEasy means the creation of a significant dearth in supply, driving up the price of other apartments listed on StreetEasy because the lack of supply drives up demand.

---

[7] Jonathan Miller, "*Housing Notes: Compass' 'Fall Marketing Playbook' is a routine antitrust red flag*," THE REAL DEAL (ONLINE) (Aug. 10, 2026), at https://therealdeal.com/national/2026/08/10/compass-fall-marketing-playbook-is-an-antitrust-red-flag/.

[8] *Id.*

9. This is statistically evident in August of 2026 – and will likely get worse as Compass continues to remove more listings from StreetEasy in its attempt to harm Zillow and other digital platforms who do the same work. Indeed, as stated by The Real Deal, this conduct is counterintuitive to normal market behavior and is purely being done "to starve StreetEasy/Zillow of inventory amid Compass's ongoing corporate war with the platform."[9] The Real Deal continues that the strategy "of Compass leadership directing agents en masse to remove active seller listings from the market's dominant portal, timed to a corporate dispute, without clear seller disclosure, while describing it publicly to the press as routing seasonal strategy is a bad look."[10]

10. As a matter of fact, Compass' "strategy" has intentionally caused an existential surge in the price of rental unit-specific apartments in New York City. The cause of this is that apartment inventory has precipitously dropped, creating a supply shock. As of August 13, 2026, inventory across all areas of New York City for rental units have dropped 40% in the past year.[11] Market reports found that this corresponded with a 3% price increase for June of 2026 as compared to June of 2025, with double the price increase (6%) for July of 2026 as compared to July of 2026.[12] Renters in New York City already spend more than 30% of their income on rent – a "threshold economists classify as unaffordable" – and prices continue to rise, making the dream of living in New York City ever more out of reach.

---

[9] *Id.*

[10] *Id.*

[11] Annie Kelly, "*Finding an apartment in Manhattan is getting even harder, as listings plummet and rents reach $5,000*," BUSINESS INSIDER (ONLINE) (Aug. 13, 2026), at https://www.businessinsider.com/manhattan-apartment-rent-increase-inventory-drops-zohran-mamdani-2026-8.

[12] *Id.*

11. This issue has accelerated in August of 2026, as the amount of listings available in Manhattan, for example, have fallen 7% week-over-week between the first and second week of August.[13] By the second week of August of 2026, active listings in Manhattan had fallen 11% since August 1, 2026.

12. In a letter addressing similar conduct, United States Senator Elizabeth Warren of the Committee on Banking, Housing and Urban Affairs stated in relevant part, that Compass "threatens to create a two-tiered housing market where insiders pay for exclusive access to housing inventory and market data, while everyone else is shut out. I am concerned that this move will increase industry consolidation and harm consumers by driving up housing costs and worsening inequalities in the housing market."[14] Compass' behavior that Senator Warren describes as "anti-competitive" is already driving up housing costs and worsening inequalities in the housing market in New York City.

13. A home – "*a place to rear ones' children and a place to rest ones' head*," as former United States Senator Robert Francis Kennedy of New York once famously said – is one of the most important components of any person's life. Compass, a titan of the housing industry throughout the entirety of the United States, is responsible for a conspiracy to monopolize and harm hardworking New Yorkers in the New York City-metro area.

14. Throughout the Class Period (and continuing through the present day), prices for rental units in the New York City-metro area, which is already among the most expensive housing

---

[13] Jake Indursky, "*How Compass' playbook is hitting New York City listings*," THE REAL DEAL (ONLINE) (Aug. 17, 2026), at https://therealdeal.com/new-york/2026/08/17/listings-fall-in-nyc-after-compass-off-streeteasy-push/.

[14] *United States Senator Elizabeth Warren's August 6, 2026 Letter to Robert Reffkin, CEO of Compass Inc.*, at https://www.banking.senate.gov/imo/media/doc/compass_mred_letter.pdf.

markets in the United States, is artificially higher than they otherwise would have but for the Defendant's' conduct.

15. As such, Plaintiffs Castaneda and Gelfand allege that this conduct is unlawful under Section 2 of the Sherman Antitrust Act as well as New York's Donnelly Act. Through this Action, Plaintiffs Castaneda and Gelfand bring this action to recover their actual damages and trebled damages; disgorgement of profit into a constructive trust; injunctive relief through an order of this Court to cease Defendant's unlawful conduct; reasonable costs and attorneys' fees; pre- and post-judgment interest; and any other relief that this Court deems just and proper for Plaintiffs Castaneda and Gelfand as well as on behalf of all others similarly situated.

## II. JURISDICTION AND VENUE

16. *Subject Matter and Supplemental Jurisdiction.* This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26). Additionally, this Court has supplemental jurisdiction over Plaintiffs' state law claims under New York's Donnelly Act, New York General Business Law §§ 340, *et seq.* and Plaintiffs' common law claim of unjust enrichment.

17. *Personal Jurisdiction.* This Court has personal jurisdiction over Defendant under Section 12 of the Clayton Act (15 U.S.C. § 22) and Federal Rule of Civil Procedure 4(h)(1)(A). Additionally, this Court has personal jurisdiction over Defendant because it is headquartered in New York, New York, both of the Plaintiffs in this Action are domiciled in New York, New York, Defendant conducts a substantial amount of business in New York state – and, specifically in New York, New York, and Defendant is registered to do business in the state of New York.

18. *Venue.* Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendant maintains their principal place of business, business facilities, have agents, transact business, and are otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## III. PARTIES

### PLAINTIFFS

***Plaintiff Peter Castaneda***

19. Plaintiff Castaneda is a resident of the state of New York.

20. Plaintiff Castaneda began his search for a rental unit in Manhattan, New York, New York beginning the first week of August 2026 using the StreetEasy platform. Plaintiff Castaneda found a one-bedroom apartment in downtown Manhattan on August 5, 2026 and signed a lease that day – with a lease period to begin August 10, 2026 and a monthly lease price of $5,270. Plaintiff Castaneda did not use a real estate agent to find his new apartment, and, therefore, did not pay a brokerage fee to Compass or any of its co-Defendant affiliates.

21. Plaintiff Castaneda was deprived of a normal functioning market in the Relevant Market because of the dearth in supply caused by Compass in addition to its practical economic result: higher rent prices. Plaintiff Castaneda's one-bedroom apartment, with its rental price of $5,270, far exceeds July 2026's average/median asking rent price of $4,390. This price differential, or a portion of it, would not have existed but for the severe reduction in public listings of rental units on StreetEasy, where apartment rental prices are adjusted according to the law of supply and demand on the platform.

22. As a result of the conduct of Compass and its co-Defendant affiliates, Plaintiff Castaneda believes he paid suffered damages in the form of rent overcharges or supracompetitive prices for rent in the Relevant Market.

***Plaintiff Haley Gelfand***

23. Plaintiff Gelfand is a resident of the state of New York.

24. Plaintiff Gelfand began her search for a rental unit in Manhattan, New York, New York in July of 2026 using the StreetEasy platform and noticed an increase in prices prior to signing her lease in August of 2026. Plaintiff Gelfand found a one-bedroom apartment in downtown Manhattan on August 3, 2026 and signed a lease that day – with a lease period to begin August 10, 2026 and a monthly lease price of $5,270. Plaintiff Gelfand did not use a real estate agent to find her new apartment, and, therefore, did not pay a brokerage fee to Compass or any of its co-Defendant affiliates.

25. Plaintiff Gelfand was deprived of a normal functioning market in the Relevant Market because of the dearth in supply caused by Compass in addition to its practical economic result: higher rent prices. Plaintiff Gelfand's one-bedroom apartment, with its rental price of $5,270, far exceeds July 2026's average/median asking rent price of $4,390. This price differential, or a portion of it, would not have existed but for the severe reduction in public listings of rental units on StreetEasy, where apartment rental prices are adjusted according to the law of supply and demand on the platform.

26. As a result of the conduct of Compass and its co-Defendant affiliates, Plaintiff Gelfand believes she paid suffered damages in the form of rent overcharges or supracompetitive prices for rent in the Relevant Market.

## DEFENDANT

***Defendant Compass, Inc. d/b/a Compass International Holdings***

27. Defendant Compass, Inc. is a Delaware corporation headquartered in New York, New York.

28. Compass operates an owned-brokerage business comprising over 37,000 real estate agents and, combined with its franchises and subsidiaries, operates a global network of more than 340,000 real estate agents. Compass earns revenue by collecting a share of the gross sales of real estate commissions that agents earn from home sales and rental agreements executed. Compass reported closing 250,360 residential real estate transactions in 2025, with a gross transaction value of $237 billion.

29. Compass is a publicly traded company on the New York Stock Exchange under the symbol "COMP." Pursuant to Securities and Exchange Commission regulations, Compass files an annual report for review after each fiscal year. Compass cites the very antitrust risk it faces by way of this litigation in its 2025 Annual Report to the Securities and Exchange Commission, "… antitrust claims against participants in the real estate industry have resulted, and may continue to result, in litigation and industry change, including with respect to […] listing rules[.]"[15]

[15] Compass' 2025 10-k Annual Report with the Securities and Exchange Commission (2025), at https://investors.compass.com/sec-filings/all-sec-filings/content/0001563190-26-000057/comp-20251231.htm.

## IV. FACTUAL ALLEGATIONS

***The Relevant Market***

30. ***Relevant Product and Geographic Market***. The relevant product market is the market for the lease of rental units and the relevant geographic market is in and around New York City. Specifically, this includes Manhattan, Queens, Brooklyn, the Bronx, Staten Island, and the immediate surrounding area (for example, Hoboken, New Jersey).

31. Rental unit leases in the New York City metropolitan area comprise a distinct product market and geographic area. Residents of this geographic area come to this area to move to the greatest center of urban life, New York City. New York City's relevant market for rental units, therefore, is not realistically competing with other municipalities because each municipality is distinct and has a number of factors which affect the price of living in that respective place.

32. ***How the Relevant Market Works.*** As Compass itself has stated, "the Relevant Market is made up of state-regulated real estate brokerage firms and individually licensed real estate agents. Under state laws, agents must 'hang their license' with a brokerage to do business. Brokerages take on oversight and legal responsibility for agents and provide agents with training, tools, and marketing materials, among other services. For offering these services, brokerages typically withhold a certain percentage of each commission paid to an agent on each home the agent sells. Traditionally, agents are not employees of their brokerages, but, instead, operate as independent contractors."[16]

33. Compass explains, selling agents typically list their properties on their clients' properties on their local Multiple Listing Service ("MLS") which is a digital database that real

---

[16] *See, Compass, Inc. v. Zillow, Inc., et al.*, Case No. 1:25-cv-05201-JAV (S.D.N.Y. June 24, 2025), at ECF No. 15, ¶ 24.

estate agents can use to contain properties for sale in a given geographic area. After a listing appears on an MLS, public-facing digital entities publish that information on Zillow and Compass' respective online digital platforms.

34. Once information on a given listing is made public on a platform such as Zillow or Compass, prospective home renters and purchasers can contact the seller's agent (assuming the property is not being rented out or sold by the owner themselves) to see the property or to get information on it. The differentiation between Zillow and Compass' online digital platforms is that Zillow is not a brokerage (and, therefore, does not collect commission-based fees from each sale) whereas Compass has a vested interest in protecting its ecosystem due to the fact that it is a brokerage (and, therefore, collects commission-based fees when its own brokers initiate a sale).

35. Rental agreements (and, therefore the price of rent) is set by the laws of supply and demand. Specifically, those who set rent prices (*e.g.* rental community administrators, owners of apartments, and others) set prices through various means which respond to supply and demand; these means include algorithms (including RealPage, which is used by the majority of rental communities in the United States), price setting tools, (including those which can be found on Zillow, and, therefore, on StreetEasy), and through price comparisons of other similar units on publicly available platforms, such as Zillow (and, therefore, on StreetEasy). Each of these methodologies all react to whether there is an oversupply or undersupply, for example, and whether the demand for a particular type of unit or during a specific season requires that prices react. Rental unit prices are extremely sensitive, and can change from day-to-day given the various inputs which dictate supply and demand can change at a moment's notice.

36. ***Consumer Elasticity***. Consumers do not consider apartments, condominiums, or houses for purchase as substitutes for rental units because, among other reasons, purchase of real

estate requires the ability to make a substantial down payment and to obtain financing. Nor is single-family real estate considered an economic substitute for rental units. For example, single-family properties typically do not offer amenities and security, and require maintenance and other upkeep which rental units do not.

37. All of this is especially true in New York City where there are no traditional single-family homes on traditional lots for sale: there are apartments for rent, apartments for purchase, and townhomes (or portions thereof) which fall into the same category.

38. ***The Hypothetical Monopolist Test.*** The New York City rental unit market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

39. Here, the SSNIP test is satisfied and the market is properly defined.

40. As described above, due to Compass' previous and on going conduct rental lease prices have increased above the SSNIP threshold in just a matter of weeks, let alone over an annual basis, yet those increases have not driven enough renters out of the New York rental market such that the SSNIP has become unprofitable to Compass.

***<u>Compass' Businesses</u>***

41. Compass was founded in New York City, New York 13 years ago by Ori Allon, Avi Dorfman, and current chief executive officer Robert Reffkin in October of 2012.

42. Despite humble beginnings, today, Compass has over 340,000 agents and associates who primarily function as independent contractors. Compass' rapid growth occurred through a flurry of acquisitions of other competing real estate brokerages headquartered around the country over the last dozen years:

a. **November 2014**: Compass acquires Lindsay Reishman Real Estate (Washington D.C.)

b. **April 2016**: Compass acquires Shane Aspen Real Estate (Aspen, Colorado)

c. **January 2017**: Compass acquires Bushari Real Estate (Boston, Massachusetts)

d. **April 2018**: Compass acquires Conlon (Chicago, Illinois)

e. **April 2018**: Compass acquires Northwest Group Real Estate (Seattle, Washington)

f. **June 2018**: Compass acquires The Hudson Company (Chicago, Illinois)

g. **July 2018**: Compass acquires Paragon Real Estate Group (San Francisco, California)

h. **August 2018**: Compass acquires Avenue Properties (Seattle, Washington)

i. **August 2018**: Compass acquires Pacific Union International (San Francisco, California)

j. **November 2018**: Compass acquires Wydler Brothers (Washington, D.C.)

k. **March 2019**: Compass acquires Alain Pinel Realtors (San Francisco, California)

l. **April 2019**: Compass acquires Stribling & Associates (New York, New York)

m. **April 2023**: Compass acquires Launch Real Estate (Arizona)

n. **September 2023**: Compass acquires Deasy Penner Podley/DPP (Pasadena, California)

o. **September 2023**: Compass acquires Realty Austin (Austin, Texas)

p. **September 2023**: Compass acquires Realty San Antonio (San Antonio, Texas)

q. **April 2024**: Compass acquires Latter & Blum (Louisiana and Mississippi)

r. **May 2024**: Compass acquires Parks Real Estate (Tennessee)

s. **December 2024**: Compass acquires Christies International Real Estate (London, England)

t. **February 2025**: Compass acquires Washington Fine Properties (Washington, D.C.)

u. **July 2025**: Compass acquires PorchLight Real Estate Group (Colorado)

v. **July 2025**: Compass acquires Cottingham Chalk (Charlotte, North Carolina)

w. **January 2026**: Compass acquires Anywhere Real Estate, which includes Better Homes and Gardens Real Estate, Century 21 Real Estate, Coldwell Banker, Corcoran Group, and Sotheby's International Realty (New York, New York)

43. Today, Compass is a living, breathing real estate leviathan.

44. According to a recent antitrust filing, in which Compass accused Zillow of having a monopoly, Compass describes itself as a brokerage firm with a home search platform that competes with Zillow (and, therefore, with StreetEasy).[17] Compass states that "[l]ike Zillow, access to Compass's home search platform is free to prospective buyers."[18] This, however, is a red herring.

---

[17] *See, Compass, Inc. v. Zillow, Inc., et al.*, Case No. 1:25-cv-05201-JAV (S.D.N.Y. June 24, 2025), at ECF No. 15, ¶ 4.

[18] *Id.*

45. While access to Compass's home search platform on its website and mobile application may be free to utilize – the reality is that any user of the platform, which includes prospective renters in the Relevant Market, must pay a brokers fee to a Compass' real estate agents in order to initiate a transaction to purchase or rent the homes listed on Compass' home search platform. In contrast, StreetEasy (and, more broadly, Zillow) is also free to use: however, there are options to ensure that a prospective renter does not need to pay a real estate agent a brokers fee (which, in New York City, is usually equivalent to at least one months' rent).

46. The utter dominance of Compass in the Relevant Market can be seen below in the neighborhood where both Plaintiffs rented their new apartments in August of 2026:



47. Here, in just a subsection called Tribeca which is a neighborhood in Lower Manhattan overlapping the Financial District, Compass has 46 listings for apartments to rent. However, these are merely the publicly available apartments on Compass' mobile application. Compass' list of apartments which are publicly available offers an option to jump to another page which states, "PRIVATE EXCLUSIVES. More listings match your search. Listings are only private online. All buyers & agents can access listings in physical offices or by contacting our agents." Thus, in order to get the full list of the massive amount of rental units and other apartments for sale which Compass has available, a prospective renter or renter's agent (who would conceivably receive a split commission with the Compass' seller's agent) would have to go through the Compass ecosystem. This locks a tremendous amount of inventory of available rental units behind an uncrossable moat – making it impossible for prospective renters or renter's agents to avoid paying Compass its monopoly rent. Zillow allows prospective renters to cross this moat and save themselves money on brokerage fees.

48. Compass admits this.

49. As Compass itself has stated, "every home buyer search conducted on Compass instead of Zillow is a lost opportunity for Zillow to [] make money[.]"[19] And so, Compass is financially motivated to disallow the publication of its listings on StreetEasy or Zillow because it risks the interception of those listings by other real estate brokers (*e.g.* buyers agents who do not work for Compass) with a resulting fee split that otherwise would have entirely gone to Compass.

---

[19] *Id.*, at ¶ 8.

***Compass Has Monopolized the Relevant Market***

50. It is an unassailable truth that Compass has monopolized (or has attempted to monopolize) the Relevant Market.

51. Compass was able to obtain its statistically significant market share in the Relevant Market involving rental units in New York City through an aggressive strategy of mergers and acquisitions. With an 80% market share for rental unit listings in Manhattan, the ability to impact prices due to their large market share (and the corresponding impact on non-Compass listings) due to the laws of supply and demand, and their deliberate manipulation of the Relevant Market through their delisting strategies, Compass meets each of the various tests which ascertain whether a monopolist controls a given product market.

52. ***Compass Controls the Relevant Market.*** Compass' strategy of acquiring its competitors took form only years after its founding. And, since that period, Compass has engaged in approximately two dozen mergers and acquisitions involving other real estate brokerages. This is important for three reasons: (1) it allows Compass to gain a reputational foothold in geographic areas where they otherwise did not previously compete or compete at the level that Compass desired, (2) it gave Compass access to the client-base for each of those brokerages which instantly increased its market share for listings in that geographic market and (3) it gave Compass the labor and resources to continue to facilitate its business and serve in the respective region or regions that the acquired or merged brokerage competed in.

53. This is no different than what occurred in New York.

54. Compass has acquired Stribling & Associates (2019), Christie's International Real Estate (2024) and Anywhere Real Estate (2026) (which includes Better Homes and Gardens Real Estate, Century 21 Real Estate, Coldwell Banker, Corcoran Group, and Sotheby's International

Realty). Combining seven different real estate brokerages into Compass made Compass what it is today and gave it monopoly power through acquisition. Compass was already a substantial competitor in the Geographic Market, and the acquisition or merger of its competitors left it with almost no one to compete with.

55. A 2025 chart of the companies acquired by Compass (including Compass itself) shows how statistically and financially significant this is:

**TOP 20 NYC REAL ESTATE TRANSACTIONS IN 2025 (CRAINS NEW YORK)**

| **RANKING** | **COMPANY** | **GROSS SALES** | **REALTORS** |
|---|---|---|---|
| 1 | *Compass, Inc.* | $19.3 billion | 3,760 |
| 3 | *Corcoran Group* | $15.4 billion | 1,982 |
| 5 | *Sotheby's Int'l Realty* | $3.9 billion | 404 |
| 12 | *Caldwell Banker* | $473.7 million | 133 |

56. If one were to combine each of these entities listed in the Top 20 New York City Real Estate Transactions in 2025 into one entity – which Compass is – then the total gross sales would exceed $39 billion, more than double of the amount of Compass' closest competitor (Douglas Elliman) and **more than all of the other competitors listed on the Top 20 combined.**

57. This control, and an 80% market share in the Relevant market in Manhattan alone, is outside of the realm of what is acceptable in a competitive market checked by the antitrust laws – and is the type of acquisition history leaves other competitors unable to compete, makes it harder for consumers to navigate renting or purchasing a home as well as harder for those in the labor market in the Relevant Market to find meaningful and competitively compensated work.

58. This is the type of behavior that the antitrust laws seek to prevent.

59. ***Compass Impacts Prices Due to Their Market Share.*** Due to Compass's outsized market share, it is able to control the price of rental units in the Relevant Market. The reason for this is because it can literally dictate pricing for as much as 80% of Manhattan's rental units, for example, as the listing agent for those properties.

60. Additionally, the price of rental units in the Relevant Market respond to supply and demand. With respect to demand, the pricing of a rental unit is a sensitive process, because there are a whole host of factors which impact the potential demand for a unit.

61. These factors include:

a. The season;

b. Proximity to schools;

c. Proximity to the subway;

d. Proximity to major landmarks (*e.g.* Central Park or Prospect Park) and to water (*e.g.* the East River and the Hudson River);

e. Amenities in a building;

f. The size of the unit;

g. The location of the unit within the building (*e.g.* whether the unit is a corner unit or is on a higher floor); and

h. The popularity of a given neighborhood.

62. Compass's control over such a massive share of rental units in New York City means that they can override normal functioning market demand to different factors through their own pricing – or, as discussed above, through delisting apartments from digitally powered public databases.

63. According to data compiled by RealPlus, 18% of Compass' listings were moved either temporarily or permanently to "off-market" which means they were delisted from StreetEasy and other publicly available databases.[20]

64. Much of these dynamics play into Compass' control of supply – and, therefore, the ability to manipulate demand. With less apartments to choose from on StreetEasy, for example, due to Compass' deliberate delisting strategy, it nullifies the factors that would ordinarily drive demand for rental units in the Relevant Market. For example, prospective renters may be willing to pay a higher price for an apartment which, in an ordinary market, would be a significantly lower monthly rental price.

65. All of this is to Compass' benefit.

66. The reason this benefits Compass is because higher prices for rental units mean higher commission amounts based off the commission-based fee schedules that Compass collects from its real estate agents as a broker.

67. Furthermore, Compass funnels the supply of apartments to its benefit to achieve more financial success which a normal functioning market would not tolerate. Specifically, this means that Compass can and does delist its rental unit listings from publicly available sources and exclusively into Compass's control. Next, with control over these listings, it deprives prospective renters of a significant share of the available rental units so those prospective renters would have to go through Compass' ecosystem in order to gain access to the listings which are only privately available. This not only deprives Zillow of the ability to feed a significant amount of rental unit listings to prospective renters and drives Zillow's profitability into the ground, but it forces renters

[20] Jake Indursky, "*How Compass' playbook is hitting New York City listings*," THE REAL DEAL (ONLINE) (Aug. 17, 2026), at https://therealdeal.com/new-york/2026/08/17/listings-fall-in-nyc-after-compass-off-streeteasy-push/.

to pay brokers fees to Compass and only Compass when those renters ordinarily would not pay any brokers fee at all or, alternatively, would have had real estate agents from competitor firms who would split commission-based fees with Compass.

68. All of this makes an already supply-strapped and unaffordable New York City even more deprived of supply, adding more fees and hoops for prospective renters to jump through, and ultimately increases the price of or imposes supracompetitive prices on every single rental unit in New York City – whether it is a listing controlled by Compass or otherwise.

69. The deprivation of consumer choice inevitably leads to higher prices – as StreetEasy said in response to Compass' delisting strategy, "[t]hese are real homeowners who listed their properties to get maximum exposure; instead, their homes were quietly pulled from the platform where New York buyers search most, without any apparent benefit to them. Now, hundreds of sellers and agents have less visibility and hundreds of buyers have fewer choices."[21]

***<u>Compass's Conduct Has Drawn Antitrust Scrutiny</u>***

70. According to The Real Deal, Compass's conduct has drawn consternation from local and federal authorities.[22]

71. In June, The Real Deal reported that Letitia James, the Attorney General of New York, was investigating Compass's conduct in the New York City area by talking to other

---

[21] Jake Indursky, "*How Compass' playbook is hitting New York City listings*," THE REAL DEAL (ONLINE) (Aug. 17, 2026), at https://therealdeal.com/new-york/2026/08/17/listings-fall-in-nyc-after-compass-off-streeteasy-push/.

[22] *Id.*

brokerage leaders.[23] Compass declined to comment and the investigation comes after Compass's merger with Anywhere Real Estate.[24]

72. Additionally, United States Senator Elizabeth Warren has begun to probe Compass over its allegedly "anti-competitive" conduct.[25]

***Antitrust Injury***

73. There have been significant injuries to renters, competitors, and the labor market alike.

74. Renters have been harmed through Compass's consolidation of a significant share of available rental units in the Geographic Market and the concentration of access (or lack thereof) to those rental units. In addition to the natural harms that flow from concentration (including higher prices and reduced consumer choice), renters have been injured through the deliberate delisting process – the concentration of the Relevant Market and the delisting process, in tandem, is touted by Compass as strategy. The impact of this purported strategy is to drive up rental unit prices, deprive the market of consumer choice (through having less options to find apartments as well as price competition between real estate brokerages for listings), and to force more renters to pay brokers fees when they ordinarily would not have had to. Even these brokers fees are higher amounts than what the usual market would tolerate because they are tied to the price of the rental unit's monthly cost itself.

---

[23] *Id.*

[24] Sheridan Wall, "*NY AG probing Compass over antitrust concerns*," THE REAL DEAL (ONLINE) (Jun. 3, 2026), at https://therealdeal.com/new-york/2026/06/03/ny-ag-probing-compass-antitrust-concerns/.

[25] *United States Senator Elizabeth Warren's August 6, 2026 Letter to Robert Reffkin, CEO of Compass Inc.*, at https://www.banking.senate.gov/imo/media/doc/compass_mred_letter.pdf.

75. The economic impact on price due to the lack of supply can be seen below as follows:




76. The deleterious impact on the Relevant Market, according to Bloomberg, is "attributed to a growing share of inventory 'going private' thanks to [] brokers increasingly keeping listings off public portals like StreetEasy or RentHop, according to the Jonathan Miller, the director of markets at StreetMatrix.[26] This conduct is not limited to just one borough; for example, in Brooklyn, median rent hit a record $4,500 while inventory has fallen by 27% over the

[26] Paulina Cachero, "*Manhattan Rents Hit $5,000 Record While Listings All But Vanish,*" BLOOMBERG (ONLINE) (August 13, 2026), at https://www.bloomberg.com/news/articles/2026-08-13/apartments-for-rent-in-nyc-record-high-prices-inventory-plunges?in_source=onboarding_confirmation&source=onboarding_confirmation.

past year.[27] According to Miller, this "is not normal. There's a lot of inventory that's going behind paywalls that the market can't see."[28]

77. And, as previously stated, more renters than ever are paying broker's fees for rental apartments and this is all by design. As Bloomberg states, "tenants are forking over $4,000 broker fees to access hidden listings and avoid competition."[29]

78. New York City's rental market was already on the verge of being broken, and Compass decided, to its own benefit, to shatter it.

79. Competitors and the labor market have been harmed by this same conduct.

80. Compass identifies Zillow as a competitor in its antitrust filings – and even named Zillow in emails to its real estate agents with respect to their delisting strategy. This vendetta against Zillow harms Zillow and other publicly available databases which are now being deprived of listings due to the delisting strategy. As Compass itself stated, "every home buyer search conducted on Compass instead of Zillow is a lost opportunity for Zillow to [] make money[.]"[30] And so, Compass chose not to compete on the merits, but to wield its control over the listings themselves to ensure that Zillow (and, therefore, StreetEasy) is deprived of access to the marketing of those listings.

81. The labor market is also harmed by the consolidation of seven brokerages which have served the Geographic Market into Compass's brokerage. This is because the power that Compass now has eliminates the ability of real estate agents to force the various brokerages in the

---

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *See, Compass*, ECF No. 15, at ¶ 8.

Geographic Market to compete for their independent contractor services. This is a major problem because real estate agents in America are already struggling to make ends meet: 45% of real estate agents, according to Yahoo!, cannot or are struggling to pay their own rents.[31]

## V. CLASS ALLEGATIONS

82. Plaintiffs Castaneda and Gelfand bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

> All persons in the New York City metro area that are purchasers of rental units and began their rental agreement at any time during the period of August 1, 2026, until the Defendant's unlawful conduct and its anticompetitive effects cease to persist.

83. The Class is so numerous that joinder of all members in this action is impracticable. There are tens of thousands if not hundreds of thousands of members in the proposed Class.

84. Plaintiffs' claims are typical of those of the Class.

85. Plaintiffs and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more for multifamily residential leases than they otherwise would have in a competitive market.

86. Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are not antagonistic to the Class.

87. Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be individual to individual class members, since the Defendant has acted and refused to act on grounds generally applicable to the Class.

---

[31] Serah Louis, "'*Incredible distortions in our marketplace': 45% of real estate agents claim they're struggling to pay rent – another bad sign for the housing market*," YAHOO! (MONEYWISE) (ONLINE) (Dec. 24, 2023), at https://finance.yahoo.com/news/incredible-distortions-marketplace-45-us-121500813.html.

88. Questions of law and fact common to the Class include:

a. Whether Defendant monopolized or attempted to monopolize the Relevant Market during the Class Period;

b. Whether Defendant's conduct with respect to consolidating the Relevant Market caused the prices of rental units to be higher than the competitive level as a result of their monopolization or attempted monopolization during the Class Period;

c. Whether Defendant's conduct with respect to delisting rental unit listings caused the prices of rental units to be higher than the competitive level as a result of this conduct during the Class Period;

d. Whether Defendant's conduct both with respect to consolidating the Relevant Market and delisting rental unit listings in tandem caused the prices of rental units to be higher than the competitive level as a result of this collective conduct during the Class Period;

e. Whether Defendant was unjustly enriched;

f. Whether Plaintiffs and Class members were injured by Defendant's conduct and, if so, the determination of the appropriate class-wide measure of damages; and

g. Whether Plaintiffs and Class members are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

89. Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

90. Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without

the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## FIRST CAUSE OF ACTION

### VIOLATION OF SECTION 2 OF THE SHERMAN ACT
MONOPOLIZATION
(OR, ALTERNATIVELY, ATTEMPTED MONOPOLIZATION)

15 U.S.C. § 2

(ON BEHALF OF THE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF)

91. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

92. Beginning in December of 2024 and proceeding through January of 2026, with the acquisition of at least seven real estate firms, Defendant formed a monopoly in order to control the Relevant Market. The consolidation of these firms allowed Defendant to obtain an 80% market share for rental units in Manhattan alone, as well as the power to dictate and otherwise manipulate the price of rental units beginning as late as August 1, 2026. This conduct either monopolized or came dangerously close to the monopolization of the Relevant Market with the intent to control it.

93. Additionally, beginning in August of 2026, Defendant enacted a strategy to delist its rental unit listings from publicly available forums, including StreetEasy, in the Relevant Market to: (1) distort the price of rental units in the Relevant Market, (2) reduce consumer choice and funnel consumers to itself, and (3) to harm competition, including Zillow and others.

94. The choice to boycott Zillow and other publicly available digital listing platforms by refusing to provide them with Defendant's rental unit listings in the Relevant Market has no pro-competitive justification; any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

95. The Defendant's conduct is unlawful under a *per se* mode of analysis.

96. In the alternative, the Defendant's' conduct is unlawful under either a quick look or rule of reason mode of analysis.

97. As a result of the harm caused, which is explained in detail above, Plaintiffs and Class members are entitled to equitable and injunctive relief, as well as reasonable costs and attorneys' fees, pre- and post-judgment interest, and any other relief this Court deems just and proper.

## SECOND CAUSE OF ACTION

**VIOLATION OF THE DONNELLY ACT**
CREATION OF A TRUST
(OR, ALTERNATIVELY, ATTEMPTED CREATION OF A TRUST)

NEW YORK GEN. BUS. LAW § 340

(ON BEHALF OF THE CLASS FOR DAMAGES)

98. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

99. Beginning in December of 2024 and proceeding through January of 2026, with the acquisition of at least seven real estate firms, Defendant formed a trust in order to control the Relevant Market. The consolidation of these firms allowed Defendant to obtain an 80% market share for rental units in Manhattan alone, as well as the power to dictate and otherwise manipulate the price of rental units beginning as late as August 1, 2026.

100. Additionally, beginning in August of 2026, Defendant enacted a strategy to delist its rental unit listings from publicly available forums, including StreetEasy, in the Relevant Market to: (1) distort the price of rental units in the Relevant Market, (2) reduce consumer choice and funnel consumers to itself, and (3) to harm competition, including Zillow and others.

101. The choice to boycott Zillow and other publicly available digital listing platforms by refusing to provide them with Defendant's rental unit listings in the Relevant Market has no pro-competitive justification; any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

102. The Defendant's conduct is unlawful under a *per se* mode of analysis.

103. In the alternative, the Defendant's' conduct is unlawful under either a quick look or rule of reason mode of analysis.

104. As a result of the harm caused, which is explained in detail above, Plaintiffs and Class members are entitled to actual and treble damages under the Donnelly Act, as well as reasonable costs and attorneys' fees, pre- and post-judgment interest, and any other relief this Court deems just and proper.

## <u>THIRD CAUSE OF ACTION</u>

## UNJUST ENRICHMENT

(ON BEHALF OF THE CLASS FOR DISGORGEMENT OF PROFIT INTO A TRUST)

105. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

106. As alleged herein, Defendant obtained money and profits that unjustly enriched themselves at the expense of the Plaintiffs and Class members, and otherwise obtained financial benefits that they would not have otherwise obtained had they acted in a fair and just manner.

107. Defendant's conduct was wrongful, knowing, and conscious.

108. Plaintiffs and Class members suffered injury-in-fact and have lost money as a result of Defendant's unjust conduct in that they paid more for their rental units than its fair value would have allowed in a competitive market. Plaintiffs and Class members lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of financial profits that Defendant obtained as a result of their unjust conduct.

## VI. REQUEST FOR RELIEF

**WHEREFORE,** Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request judgment against Defendant as follows:

A. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. The unlawful monopoly (or attempted monopoly) alleged herein be adjudged and decreed in violation of Section 2 of the Sherman Act and as an unlawful trust in violation of the Donnelly Act;

C. Plaintiffs and the Class recover damages and non-restitutionary disgorgement of financial profits to the maximum extent allowed under the applicable laws in favor of Plaintiffs and the members of the Class be entered against Defendant in an amount to be trebled to the extent such antitrust laws permit;

D. Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E. Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law and Plaintiffs and the members of the Class have such other and further relief, including injunctive relief, as the case may require and the Court may deem just and proper.

## VII. JURY TRIAL DEMAND

109. Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**DATED**: August 19, 2026

Respectfully submitted,

*/s/ Blake Hunter Yagman*
Blake Hunter Yagman
*blake.yagman@yagmanpllc.com*
**YAGMAN PLLC**
626 RexCorp Plaza, Suite 605
Uniondale, New York 11556
Tel.: (929) 709-1493

*Attorneys for Plaintiff and Proposed Class*