**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**MANHATTAN DIVISION**

CHARLES LIEBERMAN, on behalf of himself and all others similarly situated,

*Plaintiff*,

v.

COMPASS, INC. D/B/A COMPASS INTERNATIONAL HOLDINGS,

*Defendant*.

**Case No.** 1:26-cv-07077

**AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........ 1

II. JURISDICTION AND VENUE ........ 8

III. PARTIES ........ 9

A. PLAINTIFF ........ 9

1. Plaintiff Charles Lieberman ........ 9

*B.* DEFENDANT ........ 10

1. Defendant Compass, Inc. d/b/a Compass International Holdings ........ 10

IV. FACTUAL ALLEGATIONS ........ 11

A. The Relevant Market ........ 11

B. Compass' Businesses ........ 15

*C.* Compass Has Monopolized the Relevant Market ........ 19

D. Compass' Conduct Has Drawn Antitrust Scrutiny ........ 24

E. Antitrust Injury ........ 26

V. CLASS ALLEGATIONS ........ 28

FIRST CAUSE OF ACTION VIOLATION OF SECTION 2 OF THE SHERMAN ACT MONOPOLIZATION (OR, ALTERNATIVELY, ATTEMPTED MONOPOLIZATION) 15 U.S.C. § 2 (ON BEHALF OF THE CLASS FOR DAMAGES, INJUNCTIVE AND EQUITABLE RELIEF) ........ 30

SECOND CAUSE OF ACTION VIOLATION OF SECTION 2 OF THE SHERMAN ACT MONOPOLY LEVERAGING (OR, ALTERNATIVELY, ATTEMPTED MONOPOLY LEVERAGING) 15 U.S.C. § 2 (ON BEHALF OF THE CLASS FOR DAMAGES, INJUNCTIVE AND EQUITABLE RELIEF) ........ 31

THIRD CAUSE OF ACTION VIOLATION OF THE DONNELLY ACT CREATION OF A TRUST (OR, ALTERNATIVELY, ATTEMPTED

CREATION OF A TRUST) NEW YORK GEN. BUS. LAW § 340 (ON BEHALF OF THE CLASS FOR DAMAGES) ........ 32

FOURTH CAUSE OF ACTION UNJUST ENRICHMENT (ON BEHALF OF THE CLASS FOR DISGORGEMENT OF PROFIT INTO A TRUST) ........ 33

REQUEST FOR RELIEF ........ 34

JURY TRIAL DEMAND ........ 35

Plaintiff CHARLES LIEBERMAN ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following Class Action Complaint (the "Action") against the above-captioned Defendant, COMPASS, INC. D/B/A COMPASS INTERNATIONAL HOLDINGS ("Compass" or "Defendant"), upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of his counsel as follows:

## I. INTRODUCTION

1. Plaintiff Lieberman brings this Action against Defendant Compass, Inc. d/b/a Compass to seek redress under the federal and state antitrust laws on behalf of himself and a class of all persons in the borough of Manhattan, New York City, New York (the "geographic market") who have leased non-rent stabilized, multifamily residential real estate units ("rental units") from December 1, 2024 through the present (the "Class Period").

2. Compass created a trust and has attempted to monopolize or actually did monopolize the market for rental units in the geographic market (the "Relevant Market") as a result of its acquisition of some of its largest competitors. Compass, which now owns every competitor real estate brokerage firm listed in *footnote 2*, controls over 80% of the rental unit listings available for renters in Manhattan based on 2025 data.[1] Rather than compete in the Relevant Market on the merits to attain high profits, Compass instead neutralized competitors by acquiring them.[2] Then it

---

[1] Jake Indursky & Sheridan Wall, *Compass taps NYC agents to remove listings from StreetEasy*, THEREALDEAL (ONLINE) (Updated Aug. 7, 2026), at https://therealdeal.com/new-york/2026/08/06/compass-taps-nyc-agents-to-remove-listings-from-streeteasy/ (last accessed Sept. 3, 2026).

[2] In January of 2026, Defendant Compass acquired Anywhere Real Estate for $1.6 billion, creating the largest real estate brokerage in the world.

*See*, https://www.floridarealtors.org/news-media/news-articles/2026/01/compass-completes-16b-anywhere-acquisition (last accessed Aug. 19, 2026).

These affiliates and brokerages now include: Anywhere Integrated Services LLC, Anywhere Advisors LLC, Anywhere Leads Inc., Better Homes & Gardens Real Estate LLC, Century 21

turned its sights on renters, including Plaintiff Lieberman and Class members, to extract as much as it could from them through its control of the Relevant Market, as detailed below.

3. *First*, in violation of the antitrust laws, Compass achieved monopoly status by acquiring nearly all of its competitors. This allowed Compass to neutralize its competition in the New York City-metro area by aligning the interests of competing real estate brokerages with its own. This began with Compass' acquisition of a real estate brokerage called Christies in December of 2024. In January of 2026, Compass acquired Anywhere Real Estate, which on its own already had a dominant market share in Manhattan.

4. *Second*, Compass erected a wall that separated the renters from the listings. Compass artificially restricted the public supply of listings by pulling rental listings off the public market and only offering them as "Private Exclusive" listings that the public could not see. The immediate impact of this practice was to harm the ability of renters to have different types of access to public listings through online search platforms like Zillow, Apartments.com, Redfin, and others. As supply on publicly available platforms shrinks, prices for the properties (and therefore for the rest of the responding market) elevate because renters are competing for the same small slice of the pie. It also allows Compass to gain control over a corresponding submarket, the online search market, which is the core distribution method of getting renters to view and acquire rental property contracts in today's digital age. From the start of the Class Period (December 2024), Compass' anti-competitive conduct caused rent in New York to soar, as the supply of rental listings "vanished":

---

Real Estate LLC, Coldwell Banker Real Estate LLC, ERA Real Estate LLC, Corcoran Group LLC, Compass Inc. d/b/a Compass, and Sotheby's International Realty Affiliates LLC.

*See*, https://privacy.anywhere.re/global-privacy-notice/ (last accessed Aug. 19, 2026).




5. *Finally*, Compass, after delisting its properties from publicly available sources, relists them on its own platform in order to collect monopoly rents in the form of brokers fees that renters either pay directly or in the form of higher rent prices, like Plaintiff Lieberman did. While this may seem innocuous, it is really an attempt to force renters into its ecosystem: a platform which necessitates the payment of brokers fees to access listings and resultingly find an apartment.

6. Compass has done this not just through its acquisition of nearly all of its competitors, but also through the manipulation of renters' access to available listings of rental units through digital platforms.

7. Indeed, in addition to Compass' campaign to eliminate its competition, much of the harm emanating from Compass' conduct is tied to the publication of listings of rental units for prospective renters. Compass, led by its chief executive Robert Reffkin, has been engaged in both

a litigative and public relations-based war with Zillow – the top free digital platform which endeavors to list every single available unit for rent or sale across the United States. In the geographic market, Zillow operates through a subsidiary called StreetEasy, which provides prospective renters and homebuyers with access to New York City properties through a website and mobile application. For years, the concept of having all rental units for prospective renters in one place has led to Zillow's StreetEasy platform having a 70-80% market share in the Relevant Market for the provision of available listings.[3] To be clear, StreetEasy does not function as a brokerage – rather, it makes available brokerages' listings for rental units through a platform which allows prospective renters easy access to those brokerages themselves: StreetEasy functions as the host for prospective renters to find rental units, while brokerages provide those rental units themselves.

8. In Compass' second quarter earnings call in August of 2026, Reffkin was asked about his desire to compete with Zillow (and, therefore, StreetEasy), to which he responded "[i]s it unreasonable to expect that the company that has the most listings in the United States is the number one place people search in the United States? I don't think so."[4] Reffkin claimed that, by the end of the third quarter, "80% of listings from Compass" will be listed as coming soon on Compass' own website and on a competitor digital platform to Zillow called Redfin.[5] The benefit

[3] Kathryn Lindsay, '*Amazon for real estate': how the StreetEasy app took over New York*, THE GUARDIAN (ONLINE) (Feb. 9, 2022), at https://www.theguardian.com/lifeandstyle/2022/feb/09/streeteasy-new-york-housing-rental (last accessed Sept. 3, 2026).

[4] Jake Indursky, "*People will search where the inventory is": Robert Reffkin lays out Compass' portal ambitions*, THE REAL DEAL (ONLINE) (Aug. 5, 2026), at https://therealdeal.com/national/2026/08/05/compass-ceo-robert-reffkin-lays-out-portal-ambitions/ (last accessed Sept. 3, 2026).

[5] *Id.*

to Compass has already been substantial, with an increase of 111% of daily visitors to Compass' own website as compared to 2025.[6] All of this is consistent with Compass' "Fall Marketing Playbook" which "involves hiding listings from the public" in an attempt to "enable its own agents to double-dip to increase revenue per transaction, boost its stock price and effectively ignore the consumer."[7] In what The Real Deal, the leading real estate news industry publication, calls an "antitrust red flag," the recap of Compass' conduct was explained as follows:

> On July 22, at two meetings held at Extell's Central Park Tower, [Compass] CEO Robert Reffkin and other brokerage heads told top NYC agents to temporarily pull their listings off StreetEasy starting in August. A follow-up email spelled out a "playbook" whose first step was literally "***delist your listings from StreetEasy***," followed by re-routing the listing through [Real Estate Board of New York's] Residential Listing Service using the "Participant's Only" designation. This status shares the listing with other agents in the [Residential Listing Service] network but keeps it off public-facing sites entirely. When asked about it, a Compass spokesperson characterized the meetings simply as a discussion of strategies for the fall market, a notably bland description for a directive whose first line is "delist."[8]

9. There are numerous problems with this for renters in the Relevant Market.

10. *First*, StreetEasy is a free-to-use platform with access to brokers who do not charge a brokers' fee, whereas access to Compass' listings requires a registration by renters in addition to only having access to brokers' fee units. The rerouting of Compass' listings through REBNY's Residential Listing Service ("RLS") intentionally results in depriving consumers of free-to-access portals to find rental units and instead mandates the use of a broker (which necessitates broker fees) to find a rental unit. *Second*, Compass has the ability to distort the market for rental units in

---

[6] *Id.*

[7] Jonathan Miller, *Housing Notes: Compass' 'Fall Marketing Playbook' is a routine antitrust red flag*, THE REAL DEAL (ONLINE) (Aug. 10, 2026), at https://therealdeal.com/national/2026/08/10/compass-fall-marketing-playbook-is-an-antitrust-red-flag/ (last accessed Sept. 3, 2026).

[8] *Id.* (emphasis added)

the Relevant Market through its monopoly power over 80% of the listings in Manhattan alone. With control over those listings, choosing to delist them from free-to-use platforms like StreetEasy means the creation of a significant dearth in supply, driving up the price of other apartments listed on StreetEasy because the lack of supply drives up demand.

11. This is statistically evident, as depicted in the chart provided above – and will likely get worse as Compass continues to remove more listings from StreetEasy in its attempt to harm Zillow and other digital platforms who do the same work. Indeed, as stated by The Real Deal, this conduct is counterintuitive to normal market behavior and is purely being done "to starve StreetEasy/Zillow of inventory amid Compass' ongoing corporate war with the platform."[9] The Real Deal continues that the strategy "of Compass leadership directing agents en masse to remove active seller listings from the market's dominant portal, timed to a corporate dispute, without clear seller disclosure, while describing it publicly to the press as routing seasonal strategy is a bad look."[10]

12. Compass' "strategy" has intentionally caused a surge in the price of rental unit-specific apartments in New York City As apartment inventory has precipitously dropped, creating a supply shock. As of August 13, 2026, inventory across all areas of New York City for rental units have dropped 40% in the past year.[11] Market reports found that this corresponded with a 3% price increase for June of 2026 as compared to June of 2025, with double the price increase (6%)

---

[9] *Id.*

[10] *Id.*

[11] Annie Kelly, *Finding an apartment in Manhattan is getting even harder, as listings plummet and rents reach $5,000*, BUSINESS INSIDER (ONLINE) (Aug. 13, 2026), at https://www.businessinsider.com/manhattan-apartment-rent-increase-inventory-drops-zohran-mamdani-2026-8 (last accessed Sept. 3, 2026).

for July of 2026 as compared to July of 2026.[12] Renters in New York City already spend more than 30% of their income on rent – a "threshold economists classify as unaffordable" – and prices continue to rise, making the dream of living in New York City ever more out of reach.[13]

13. This issue has accelerated in August of 2026, as the amount of listings available in Manhattan, for example, have fallen 7% week-over-week between the first and second week of August.[14] By the second week of August of 2026, active listings in Manhattan had fallen 11% since August 1, 2026.

14. In a letter addressing similar conduct, United States Senator Elizabeth Warren of the Committee on Banking, Housing, and Urban Affairs stated, in relevant part, that Compass "threatens to create a two-tiered housing market where insiders pay for exclusive access to housing inventory and market data, while everyone else is shut out. I am concerned that this move will increase industry consolidation and harm consumers by driving up housing costs and worsening inequalities in the housing market."[15] Compass' behavior that Senator Warren describes as "anti-competitive" is already driving up housing costs and worsening inequalities in the housing market in New York City.

15. A home – "*a place to rear ones' children and a place to rest ones' head*," as former United States Senator Robert Francis Kennedy of New York once famously said – is one of the most important components of any person's life. Compass, a titan of the housing industry

---

[12] *Id.*

[13] *Id.*

[14] Jake Indursky, *How Compass' playbook is hitting New York City listings*, THE REAL DEAL (ONLINE) (Aug. 17, 2026), at https://therealdeal.com/new-york/2026/08/17/listings-fall-in-nyc-after-compass-off-streeteasy-push/ (last accessed Sept. 3, 2026).

[15] *United States Senator Elizabeth Warren's August 6, 2026 Letter to Robert Reffkin, CEO of Compass Inc.*, at https://www.banking.senate.gov/imo/media/doc/compass_mred_letter.pdf (last accessed Sept. 3, 2026).

throughout the entirety of the United States, is responsible for a campaign to monopolize and harm hardworking New Yorkers in the New York City-metro area.

16. Throughout the Class Period (and continuing through the present day), prices for rental units in the New York City-metro area, which is already among the most expensive housing markets in the United States, is artificially higher than they otherwise would have but for the Defendant's conduct.

17. As such, Plaintiff Lieberman alleges that this conduct is unlawful under Section 2 of the Sherman Antitrust Act as well as New York's Donnelly Act. Through this Action, Plaintiff Lieberman brings this action to recover his actual damages and trebled damages; disgorgement of profit into a constructive trust; injunctive relief through an order of this Court to cease Defendant's unlawful conduct; reasonable costs and attorneys' fees; pre- and post-judgment interest; and any other relief that this Court deems just and proper for Plaintiff Lieberman as well as on behalf of all others similarly situated.

## II. JURISDICTION AND VENUE

18. *Subject Matter and Supplemental Jurisdiction.* This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, as this action arises out of Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2) and Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26). Additionally, this Court has supplemental jurisdiction over Plaintiff's state law claims under New York's Donnelly Act, New York General Business Law §§ 340, *et seq.* and Plaintiff's common law claim of unjust enrichment.

19. *Personal Jurisdiction.* This Court has personal jurisdiction over Defendant under Section 12 of the Clayton Act (15 U.S.C. § 22) and Federal Rule of Civil Procedure 4(h)(1)(A). Additionally, this Court has personal jurisdiction over Defendant because it is headquartered in New York, New York, Plaintiff in this Action is domiciled in New York, New York, Defendant

conducts a substantial amount of business in New York state – and, specifically in New York, New York, and Defendant is registered to do business in the state of New York.

20. *Venue.* Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because Defendant maintains its principal place of business, business facilities, has agents, transacts business, and is otherwise found within this District and certain unlawful acts alleged herein were performed and had effects within this District.

## III. PARTIES

### A. PLAINTIFF

#### 1. Plaintiff Charles Lieberman

21. Plaintiff Lieberman is a resident of the state of New York.

22. Plaintiff Lieberman began his search for a rental unit in Manhattan, New York, New York beginning the first week of August 2025 and again in August of 2026 using the StreetEasy platform. Plaintiff Lieberman found a two-bedroom apartment in Lower East Side of Manhattan and signed a lease in August of 2026 – with a monthly lease price of $4,000 – then was told he had a brokers fee passed down to him and his co-tenant, which increased the lease price to $4,620. Plaintiff Lieberman, deprived of choice and the ability to find publicly available listings, had to re-sign his lease at an elevated price of $4,850.

23. Plaintiff Lieberman was deprived of a normal functioning market in the Relevant Market because of the dearth in supply caused by Compass in addition to its practical economic result: higher rent prices and the necessity to pay a brokers fee. Plaintiff Lieberman's two-bedroom apartment, with its rental price of $4,850, is a supracompetitive price due to deprivation of competition and the necessity to pay a brokers fee. This price differential, or a portion of it, would not have existed but for the severe reduction in public listings of rental units on StreetEasy, where

apartment rental prices are adjusted according to the law of supply and demand on the platform; the same holds true for the broker fee that Plaintiff Lieberman paid in the form of a higher rent price.

24. As a result of the conduct of Compass and its co-Defendant affiliates, Plaintiff Lieberman believes he suffered damages in the form of rent overcharges or supracompetitive prices for rent in the Relevant Market.

## B. DEFENDANT

### 1. Defendant Compass, Inc. d/b/a Compass International Holdings

25. Defendant Compass, Inc. is a Delaware corporation headquartered in New York, New York.

26. Compass operates an owned-brokerage business comprising over 37,000 real estate agents and, combined with its franchises and subsidiaries, operates a global network of more than 340,000 real estate agents. Compass earns revenue by collecting a share of the gross sales of real estate commissions that agents earn from home sales and rental agreements executed. Compass reported closing 250,360 residential real estate transactions in 2025, with a gross transaction value of $237 billion.

27. Compass is a publicly traded company on the New York Stock Exchange under the symbol "COMP." Pursuant to Securities and Exchange Commission regulations, Compass files an annual report for review after each fiscal year. Compass cites the very antitrust risk it faces by way of this litigation in its 2025 Annual Report to the Securities and Exchange Commission,

"antitrust claims against participants in the real estate industry have resulted, and may continue to result, in litigation and industry change, including with respect to … listing rules."[16]

28. Even Compass chief executive officer Robert Reffkin seems to understand the importance of free market competition unconstrained by monopolies, "[Compass is] actively infusing competition in real estate. I believe in competition. Not only does the law require companies to compete, but competition is the bedrock of our economy. Competition is the engine that produces the most value and options for consumers."[17]

## IV. FACTUAL ALLEGATIONS

### A. The Relevant Market

29. At issue in this Action is the leveraging of dominance in one market to control another submarket. Here, Compass has an 80% market share and the ability to control prices in Manhattan for rental listings – which gives it monopoly power in the Relevant Market. Compass leverages that monopoly power to harm a submarket, the online search market, which is the product market for digital platforms which contain searchable listings for rent. Zillow (and, therefore StreetEasy) has a dominant market share or monopoly power in the online search market in the geographic area. Compass, which has a competing product to Zillow/StreetEasy, is depriving its competitor in the online search market of access to rental listings – nullifying Zillow/StreetEasy's usefulness and doing so in favor of Compass' own digital platform.

---

[16] Compass, Inc.'s 2025 10-k Annual Report with the Securities and Exchange Commission (2025), at https://investors.compass.com/sec-filings/all-sec-filings/content/0001563190-26-000057/comp-20251231.htm (last accessed Sept. 3, 2026).

[17] Brooklee Han, *Amid antitrust scrutiny, Compass CEO Reffkin says MLSs are 'anti-consumer*,' HOUSINGWIRE (ONLINE) (Aug. 5, 2026), at https://www.housingwire.com/articles/reffkin-compass-mls-competition-scrutiny/ (last accessed Sept. 3, 2026).

30. This is akin to a *Standard Oil*-type of monopoly having a dominant market share or monopoly power over the distribution of oil – then stifling the method of distribution for oil in order to control both the supply of the product and its primary method of distribution (then, by train). Compass is simply following the same playbook: controlling the supply of listings and then depriving competitors in the distribution of those listings so that it can seize market share in the online search market to its benefit (as described herein).

31. *Relevant Product and Geographic Market.* The relevant product market is the market for the lease of rental units, and the relevant geographic market is the borough of Manhattan, New York City, New York.

32. Rental unit leases in Manhattan comprise a distinct product market and geographic area. Residents of this geographic area come to this area to move to the greatest center of urban life, Manhattan. Manhattan's relevant market for rental units, therefore, is not realistically competing with other municipalities because each municipality is distinct and has a number of factors which affect the price of living in that respective place.

33. *How the Relevant Market Works.* As Compass itself has stated, "the Relevant Market is made up of state-regulated real estate brokerage firms and individually licensed real estate agents. Under state laws, agents must 'hang their license' with a brokerage to do business. Brokerages take on oversight and legal responsibility for agents and provide agents with training, tools, and marketing materials, among other services. For offering these services, brokerages typically withhold a certain percentage of each commission paid to an agent on each home the

agent sells. Traditionally, agents are not employees of their brokerages, but instead operate as independent contractors."[18]

34. As Compass explains, selling agents typically list their properties or their clients' properties on their local Multiple Listing Service ("MLS"), which is a digital database that real estate agents can use to contain properties for sale in a given geographic area. After a listing appears on an MLS, public-facing digital entities publish that information on Zillow and Compass' respective online digital platforms.

35. Once information on a given listing is made public on a platform such as Zillow or Compass, prospective home renters and purchasers can contact the seller's agent (assuming the property is not being rented out or sold by the owner themselves) to see the property or to get information on it. The differentiation between Zillow and Compass' online digital platforms is that Zillow is not a brokerage (and, therefore, does not collect commission-based fees from each sale) whereas Compass has a vested interest in protecting its ecosystem due to the fact that it is a brokerage (and, therefore, collects commission-based fees when its own brokers initiate a sale).

36. Rental agreements (and, therefore the price of rent) are set by the laws of supply and demand. Specifically, those who set rent prices (*e.g.* rental community administrators, owners of apartments, and others) set prices through various means which respond to supply and demand; these means include algorithms (including RealPage, which is used by the majority of rental communities in the United States), price setting tools, (including those which can be found on Zillow, and, therefore, on StreetEasy), and through price comparisons of other similar units on publicly available platforms, such as Zillow (and, therefore, on StreetEasy). Each of these

[18] *See*, *Compass, Inc. v. Zillow, Inc., et al.*, Case No. 1:25-cv-05201-JAV, ECF No. 15, at ¶ 24 (S.D.N.Y. June 24, 2025).

methodologies all react to whether there is an oversupply or undersupply, for example, and whether the demand for a particular type of unit or during a specific season requires that prices react. Rental unit prices are extremely sensitive and can change from day-to-day given the various inputs which dictate supply and demand can change at a moment's notice.

37. *Consumer Elasticity.* Consumers do not consider apartments, condominiums, or houses for purchase as substitutes for rental units because, among other reasons, purchase of real estate requires the ability to make a substantial down payment and to obtain financing. Nor is single-family real estate considered an economic substitute for rental units. For example, single-family properties typically do not offer amenities and security and require maintenance and other upkeep which rental units do not.

38. All of this is especially true in Manhattan where there are no traditional single-family homes on traditional lots for sale: there are apartments for rent, apartments for purchase, and townhomes (or portions thereof) which fall into the same category.

39. *The Hypothetical Monopolist Test.* The New York City rental unit market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined and does not encompass sufficient economic substitutes.

40. Here, the SSNIP test is satisfied, and the market is properly defined.

41. As described above, due to Compass' previous and ongoing conduct rental lease prices have increased above the SSNIP threshold in just a matter of weeks, let alone over an annual basis, yet those increases have not driven enough renters out of the New York rental market such that the SSNIP has become unprofitable to Compass.

**B. Compass' Businesses**

42. Compass was founded in New York City, New York 13 years ago by Ori Allon, Avi Dorfman, and current chief executive officer Robert Reffkin in October of 2012.

43. Despite humble beginnings, today, Compass has over 340,000 agents and associates who primarily function as independent contractors. Compass' rapid growth occurred through a flurry of acquisitions of other competing real estate brokerages headquartered around the country over the last dozen years:

**a.** November 2014: Compass acquires Lindsay Reishman Real Estate (Washington D.C.);

**b.** April 2016: Compass acquires Shane Aspen Real Estate (Aspen, Colorado);

**c.** January 2017: Compass acquires Bushari Real Estate (Boston, Massachusetts);

**d.** April 2018: Compass acquires Conlon (Chicago, Illinois);

**e.** April 2018: Compass acquires Northwest Group Real Estate (Seattle, Washington);

**f.** June 2018: Compass acquires The Hudson Company (Chicago, Illinois);

**g.** July 2018: Compass acquires Paragon Real Estate Group (San Francisco, California);

**h.** August 2018: Compass acquires Avenue Properties (Seattle, Washington);

**i.** August 2018: Compass acquires Pacific Union International (San Francisco, California);

**j.** November 2018: Compass acquires Wydler Brothers (Washington, D.C.);

**k.** March 2019: Compass acquires Alain Pinel Realtors (San Francisco, California);

**l.** April 2019: Compass acquires Stribling & Associates (New York, New York);

**m.** April 2023: Compass acquires Launch Real Estate (Arizona);

**n.** September 2023: Compass acquires Deasy Penner Podley/DPP (Pasadena, California);

**o.** September 2023: Compass acquires Realty Austin (Austin, Texas);

**p.** September 2023: Compass acquires Realty San Antonio (San Antonio, Texas);

**q.** April 2024: Compass acquires Latter & Blum (Louisiana and Mississippi);

**r.** May 2024: Compass acquires Parks Real Estate (Tennessee);

**s.** December 2024: Compass acquires Christies International Real Estate (London, England);

**t.** February 2025: Compass acquires Washington Fine Properties (Washington, D.C.);

**u.** July 2025: Compass acquires PorchLight Real Estate Group (Colorado);

**v.** July 2025: Compass acquires Cottingham Chalk (Charlotte, North Carolina); and

**w.** January 2026: Compass acquires Anywhere Real Estate, which includes Better Homes and Gardens Real Estate, Century 21 Real Estate, Coldwell Banker, Corcoran Group, and Sotheby's International Realty (New York, New York).

44. Today, Compass is a living, breathing real estate leviathan.

45. According to a recent antitrust filing, in which Compass accused Zillow of having a monopoly, Compass describes itself as a brokerage firm with a home search platform that competes with Zillow (and, therefore, with StreetEasy).[19] Compass states that "[l]ike Zillow,

[19] *Id.* at ¶ 4.

access to Compass's home search platform is free to prospective buyers."[20] This, however, is a red herring.

46. While access to Compass' home search platform on its website and mobile application may be free to utilize, the reality is that any user of the platform, which includes prospective renters in the Relevant Market, must pay a brokers fee to a Compass real estate agent in order to initiate a transaction to purchase or rent the homes listed on Compass' home search platform. In contrast, StreetEasy (and, more broadly, Zillow) is also free to use: however, there are options to ensure that a prospective renter does not need to pay a real estate agent a brokers fee (which, in New York City, is usually equivalent to at least one month's rent).

47. The utter dominance of Compass in the Relevant Market can be seen below in the neighborhood of Tribeca located in Manhattan:




[20] *Id.*

48. Here, in Tribeca (a neighborhood in Lower Manhattan overlapping the Financial District), Compass has 46 listings for apartments to rent. However, these are merely the publicly available apartments on Compass' mobile application. Compass' list of apartments which are publicly available offers an option to jump to another page which states, "PRIVATE EXCLUSIVES. More listings match your search. Listings are only private online. All buyers & agents can access listings in physical offices or by contacting our agents." Thus, in order to get the full list of the massive amount of rental units and other apartments for sale which Compass has available, a prospective renter or renter's agent (who would conceivably receive a split commission with the Compass' seller's agent) would have to go through the Compass ecosystem. This locks a tremendous amount of inventory of available rental units behind a towering wall – making it impossible for prospective renters or renters' agents to avoid paying Compass its monopoly rent. Zillow allows prospective renters to cross this wall and save themselves money on brokerage fees.

49. Compass admits this. As Compass itself has stated, "every home buyer search conducted on Compass instead of Zillow is a lost opportunity for Zillow to [] make money."[21] And so, Compass is financially motivated to disallow the publication of its listings on StreetEasy or Zillow because it risks the interception of those listings by other real estate brokers (*e.g.* buyers agents who do not work for Compass) with a resulting fee split that otherwise would have entirely gone to Compass.

50. And Compass knows that Zillow is not the only target – it seeks to harm competition as a whole in the online search market, though Zillow happens to be Compass' target recently. As a spokesperson from Compass told the New York Post, "[a] common marketing

[21] *Id.* at ¶ 8.

strategy among top agents is to give sellers exposure to virtually all buyers through [REBNY's residential listing service] while temporarily taking the listing off of the [internet] in August, the slowest month in NYC. This marketing strategy isn't focused on pulling listings off any particular portal or website – these listings are still visible to all agents of brokerages [] and their clients. Agents have a fiduciary responsibility to recommend what is best to the seller, not to the business model of a portal that uses the listing to sell advertising."[22]

51. The reality though, is much starker than Compass' spokesperson leads the public to believe.

52. It is contrary to Compass' fiduciary responsibilities to not advertise their listings on every single medium and platform possible – more eyes on a listing for a rental unit means more competition for that rental unit. Generally, that leads to bidding wars and higher prices for sellers. Here, the self-interests of Compass supersede their desire to serve sellers – which is contrary to a normal functioning market.

**C. Compass Has Monopolized the Relevant Market**

53. Compass was able to obtain its statistically significant market share in the Relevant Market involving rental units in New York City through an aggressive strategy of mergers and acquisitions. With an 80% market share for rental unit listings in Manhattan, the ability to impact prices due to their large market share (and the corresponding impact on non-Compass listings) due to the laws of supply and demand, and their deliberate manipulation of the Relevant Market

---

[22] Lauren Elkies Schram, *See why a majority of Manhattan home listings are hidden from view – and how that costs sellers thousands of dollars*, NEW YORK POST (ONLINE) (August 18, 2026), at https://nypost.com/2026/08/18/real-estate/why-youre-only-seeing-a-fraction-of-homes-for-sale/ (last accessed Sept. 3, 2026).

through their delisting strategies, Compass meets each of the various tests which ascertain whether a monopolist controls a given product market.

54. *Compass Controls the Relevant Market.* Compass' strategy of acquiring its competitors took form only years after its founding. And, since that period, Compass has engaged in approximately two dozen mergers and acquisitions involving other real estate brokerages. This is important for three reasons: (1) it allows Compass to gain a reputational foothold in geographic areas where they otherwise did not previously compete or compete at the level that Compass desired, (2) it gave Compass access to the client-base for each of those brokerages which instantly increased its market share for listings in that geographic market, and (3) it gave Compass the labor and resources to continue to facilitate its business and serve in the respective region or regions that the acquired or merged brokerage competed in.

55. In New York, Compass has acquired Stribling & Associates (2019), Christie's International Real Estate (2024) and Anywhere Real Estate (2026) (which includes Better Homes and Gardens Real Estate, Century 21 Real Estate, Coldwell Banker, Corcoran Group, and Sotheby's International Realty). Combining seven different real estate brokerages into Compass made Compass what it is today and gave it monopoly power through acquisition. Compass was already a substantial competitor in the Geographic Market, and the acquisition or merger of its competitors left it with almost no one to compete with.

56. A 2025 chart of the companies acquired by Compass (including Compass itself) shows how statistically and financially significant this is:

**TOP 20 NYC REAL ESTATE TRANSACTIONS IN 2025 (CRAINS NEW YORK)**

| RANKING | COMPANY | GROSS SALES | REALTORS |
|---|---|---|---|
| 1 | *Compass, Inc.* | $19.3 billion | 3,760 |
| 3 | *Corcoran Group* | $15.4 billion | 1,982 |
| 5 | *Sotheby's Int'l Realty* | $3.9 billion | 404 |
| 12 | *Caldwell Banker* | $473.7 million | 133 |

57. If one were to combine each of these entities listed in the Top 20 New York City Real Estate Transactions in 2025 into one entity – which Compass is – then the total gross sales would exceed $39 billion, more than double of the amount of Compass' closest competitor (Douglas Elliman) and more than all of the other competitors listed on the Top 20 combined.

58. The result of this is shocking, and can be seen below based on transaction volume on MLS per analysis performed by the Capitol Forum (as noted, even a 30% market share of a product market may trigger regulatory scrutiny):






011412-11/5134580 V1

59. This control, and an 80% market share in the Relevant market in Manhattan alone, is outside of the realm of what is acceptable in a competitive market checked by the antitrust laws – and is the type of acquisition history that leaves other competitors unable to compete, makes it harder for consumers to navigate renting or purchasing a home as well as harder for those in the labor market in the Relevant Market to find meaningful and competitively compensated work.

60. This is the type of behavior that the antitrust laws seek to prevent.

61. *Compass Impacts Prices Due to Their Market Share.* Due to Compass' outsized market share, it is able to control the price of rental units in the Relevant Market. The reason for this is because it can literally dictate pricing for as much as 80% of Manhattan's rental units, for example, as the listing agent for those properties.

62. Additionally, the price of rental units in the Relevant Market responds to supply and demand. With respect to demand, the pricing of a rental unit is a sensitive process, because there are a whole host of factors which impact the potential demand for a unit.

63. These factors include:

**a.** The season;

**b.** Proximity to schools;

**c.** Proximity to the subway;

**d.** Proximity to major landmarks (*e.g.* Central Park or Prospect Park) and to water (*e.g.* the East River and the Hudson River);

**e.** Amenities in a building;

**f.** The size of the unit;

**g.** The location of the unit within the building (*e.g.* whether the unit is a corner unit or is on a higher floor); and

**h.** The popularity of a given neighborhood.

64. Compass' control over such a massive share of rental units in New York City means that they can override normal functioning market demand to different factors through their own pricing – or, as discussed above, through delisting apartments from digitally powered public databases.

65. According to data compiled by RealPlus, 18% of Compass' listings were moved either temporarily or permanently to "off-market" which means they were delisted from StreetEasy and other publicly available databases.[23]

66. Much of these dynamics play into Compass' control of supply – and, therefore, the ability to manipulate demand. With less apartments to choose from on StreetEasy, for example, due to Compass' deliberate delisting strategy, it nullifies the factors that would ordinarily drive demand for rental units in the Relevant Market. For example, prospective renters may be willing to pay a higher price for an apartment which, in an ordinary market, would be a significantly lower monthly rental price.

67. The reason this benefits Compass is because higher prices for rental units mean higher commission amounts based off the commission-based fee schedules that Compass collects from its real estate agents as a broker.

68. Furthermore, Compass funnels the supply of apartments to its benefit to achieve more financial success which a normal functioning market would not tolerate. Specifically, this means that Compass can and does delist its rental unit listings from publicly available sources and exclusively into Compass' control. Next, with control over these listings, it deprives prospective renters of a significant share of the available rental units so those prospective renters would have

[23] Jake Indursky, *How Compass' playbook is hitting New York City listings*, THE REAL DEAL (ONLINE) (Aug. 17, 2026), at https://therealdeal.com/new-york/2026/08/17/listings-fall-in-nyc-after-compass-off-streeteasy-push/ (last accessed Sept. 3, 2026).

to go through Compass' ecosystem in order to gain access to the listings which are only privately available. This not only deprives Zillow of the ability to feed a significant amount of rental unit listings to prospective renters and drives Zillow's profitability into the ground, but it forces renters to pay brokers fees to Compass and only Compass when those renters ordinarily would not pay any brokers fee at all or, alternatively, would have had real estate agents from competitor firms who would split commission-based fees with Compass.

69. All of this makes an already supply-strapped and unaffordable New York City even more deprived of supply, adding more fees and hoops for prospective renters to jump through, and ultimately increases the price of or imposes supracompetitive prices on every single rental unit in New York City – whether it is a listing controlled by Compass or otherwise.

70. The deprivation of consumer choice inevitably leads to higher prices – as StreetEasy said in response to Compass' delisting strategy, "[t]hese are real homeowners who listed their properties to get maximum exposure; instead, their homes were quietly pulled from the platform where New York buyers search most, without any apparent benefit to them. Now, hundreds of sellers and agents have less visibility and hundreds of buyers have fewer choices."[24]

**D. Compass' Conduct Has Drawn Antitrust Scrutiny**

71. According to The Real Deal, Compass' conduct has drawn scrutiny from local and federal authorities.[25]

72. In June, The Real Deal reported that Letitia James, the Attorney General of New York, was investigating Compass' conduct in the New York City area by talking to other brokerage

---

[24] *Id.*

[25] *Id.*

leaders.[26] Compass declined to comment and the investigation comes after Compass' merger with Anywhere Real Estate.[27]

73. On July 22, 2026, Congressman Scott Fitzgerald of the House of Representatives' Subcommittee on the Administrative State, Regulatory Reform, and Antitrust of the Committee on the Judiciary wrote a letter to Compass' chief executive officer Robert Reffkin.[28] The letter states that the subcommittee "is examining allegations that certain real estate companies have engaged in anticompetitive practices designed to insulate themselves from competition at the expense of consumers."[29]

74. Fitzgerald's letter discusses the deprivation of listings by Compass "on Zillow, Redfin, Realtor.com, or your local MLS" such that consumers cannot access them without going through Compass.[30] The result of this is that it could "limit competition by fragmenting inventory, weakening price competition, creating 'velvet ropes' around certain properties that limit access to a select group of potential buyers, potentially limiting consumer choice."[31] This is exactly what has come to pass in the Relevant Market.

---

[26] *Id.*

[27] Sheridan Wall, *NY AG probing Compass over antitrust concerns*, THE REAL DEAL (ONLINE) (Jun. 3, 2026), at https://therealdeal.com/new-york/2026/06/03/ny-ag-probing-compass-antitrust-concerns/ (last accessed Sept. 3, 2026).

[28] *United States House of Representatives' Scott Fitzgerald's July 22, 2026 Letter to Robert Reffkin, CEO of Compass, Inc*., at https://assets.inman.com/wp-content/uploads/2026/08/2026-07-22-SF-to-Compass-Reffkin-re-private-listing-networks.pdf (last accessed Sept. 3, 2026).

[29] *Id.*

[30] *Id.*

[31] *Id.*

75. Additionally, United States Senator Elizabeth Warren has begun to probe Compass over its allegedly "anti-competitive" conduct.[32]

**E. Antitrust Injury**

76. There have been significant injuries to renters, competitors, and the labor market alike.

77. Renters have been harmed through Compass' consolidation of a significant share of available rental units in the Geographic Market and the concentration of access (or lack thereof) to those rental units. In addition to the natural harms that flow from concentration (including higher prices and reduced consumer choice), renters have been injured through the deliberate delisting process – the concentration of the Relevant Market and the delisting process, in tandem, is touted by Compass as strategy. The impact of this purported strategy is to drive up rental unit prices, deprive the market of consumer choice (through having less options to find apartments as well as price competition between real estate brokerages for listings), and to force more renters to pay brokers fees when they ordinarily would not have had to. Even these brokers fees are higher amounts than what the usual market would tolerate because they are tied to the price of the rental unit's monthly cost itself.

78. The economic impact on price due to the lack of supply can be seen below as follows:

[32] *United States Senator Elizabeth Warren's August 6, 2026 Letter to Robert Reffkin, CEO of Compass Inc.*, at https://www.banking.senate.gov/imo/media/doc/compass_mred_letter.pdf (last accessed Sept. 3, 2026).




79. The deleterious impact on the Relevant Market, according to Bloomberg, is "attributed to a growing share of inventory 'going private' thanks to [] brokers increasingly keeping listings off public portals like StreetEasy or RentHop," according to the Jonathan Miller, an analyst and director of markets at StreetMatrix.[33] This conduct is not limited to just one borough; for example, in Brooklyn, median rent hit a record $4,500 while inventory has fallen by 27% over the past year.[34] According to Miller, this "is not normal. There's a lot of inventory that's going behind paywalls that the market can't see."[35]

---

[33] Paulina Cachero, *Manhattan Rents Hit $5,000 Record While Listings All But Vanish*, BLOOMBERG (ONLINE) (August 13, 2026), at https://www.bloomberg.com/news/articles/2026-08-13/apartments-for-rent-in-nyc-record-high-prices-inventory-plunges?in_source=onboarding_confirmation&source=onboarding_confirmation (last accessed Sept. 3, 2026).

[34] *Id.*

[35] *Id.*

80. And, as previously stated, more renters than ever are paying brokers fees for rental apartments, and this is all by design. As Bloomberg states, "tenants are forking over $4,000 broker fees to access hidden listings and avoid competition."[36]

81. As Miller continues, "[w]hen a consumer sits down and uses a website like StreetEasy [in New York City] they don't know if they're getting all the listings. And when you have the largest brokerage firm in the world putting a large amount of listings behind a paywall, you're forced to go through an agent of a particular company rather than anybody you want. This is a major setback in the homebuying process to the 1950s."[37]

82. New York City's rental market was already on the verge of being broken, and Compass decided, for its own benefit, to shatter it.

## V. CLASS ALLEGATIONS

83. Plaintiff Lieberman brings this Action on behalf of himself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Classes (collectively, the "Class"), which is defined as follows:

> **The Renter Class**. All persons that rented housing units in the New York City metro area and began their rental agreement at any time during the period of December 1, 2024, until the Defendant's unlawful conduct and its anticompetitive effects cease to persist.

84. Plaintiff Lieberman also seeks to represent the following Class:

> **The Brokers' Fee Class**. All persons that rented housing units and began their rental agreement at any time during the period of December 1, 2024, and paid a brokers fee either directly or indirectly to Compass (or its affiliates, subsidiaries, and acquisitions) until the Defendant's unlawful conduct and its anticompetitive effects cease to persist.

---

[36] *Id.*

[37] Lauren Elkies Schram, *See why a majority of Manhattan home listings are hidden from view – and how that costs sellers thousands of dollars*, NEW YORK POST (ONLINE) (August 18, 2026), at https://nypost.com/2026/08/18/real-estate/why-youre-only-seeing-a-fraction-of-homes-for-sale/ (last accessed Sept. 3, 2026).

85. The Class is so numerous that joinder of all members in this action is impracticable. There are tens of thousands if not hundreds of thousands of members in the proposed Class.

86. Plaintiff's claims are typical of those of the Class.

87. Plaintiff and members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more for multifamily residential leases than they otherwise would have in a competitive market.

88. Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff is not antagonistic to the Class.

89. Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be individual to individual class members, since the Defendant has acted and refused to act on grounds generally applicable to the Class.

90. Questions of law and fact common to the Class that will predominate include:

**a.** Whether Defendant monopolized or attempted to monopolize the Relevant Market during the Class Period;

**b.** Whether Defendant's conduct with respect to consolidating the Relevant Market caused the prices of rental units to be higher than the competitive level as a result of their monopolization or attempted monopolization during the Class Period;

**c.** Whether Defendant's conduct with respect to delisting rental unit listings caused the prices of rental units to be higher than the competitive level as a result of this conduct during the Class Period;

**d.** Whether Defendant's conduct both with respect to consolidating the Relevant Market and delisting rental unit listings in tandem caused the prices of rental units to be higher than the competitive level as a result of this collective conduct during the Class Period;

**e.** Whether Defendant was unjustly enriched;

**f.** Whether Plaintiff and Class members were injured by Defendant's conduct and, if so, the determination of the appropriate class-wide measure of damages; and

**g.** Whether Plaintiff and Class members are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

91. Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

92. Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit many similarly situated people to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## FIRST CAUSE OF ACTION

**VIOLATION OF SECTION 2 OF THE SHERMAN ACT**
**MONOPOLIZATION**
**(OR, ALTERNATIVELY, ATTEMPTED MONOPOLIZATION)**
**15 U.S.C. § 2**
**(ON BEHALF OF THE RENTERS CLASS AND BROKERS FEE CLASS)**

93. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

94. Beginning in December 2024 and proceeding through January of 2026, with the acquisition of at least seven real estate firms, Defendant formed a monopoly in order to control the Relevant Market. The consolidation of these firms allowed Defendant to obtain an 80% market share for rental units in Manhattan alone, as well as the power to dictate and otherwise manipulate the price of rental units. This conduct either monopolized or came dangerously close to the monopolization of the Relevant Market with the intent to control it.

95. The Defendant's conduct is unlawful under a *per se* mode of analysis.

96. In the alternative, the Defendant's conduct is unlawful under either a quick look or rule of reason mode of analysis.

97. As a result of the harm caused, which is explained in detail above, Plaintiff and Class members are entitled to equitable and injunctive relief, as well as reasonable costs and attorneys' fees, pre- and post-judgment interest, and any other relief this Court deems just and proper.

**SECOND CAUSE OF ACTION**
**VIOLATION OF SECTION 2 OF THE SHERMAN ACT**
**MONOPOLY LEVERAGING**
**(OR, ALTERNATIVELY, ATTEMPTED MONOPOLY LEVERAGING)**
**15 U.S.C. § 2**
**(ON BEHALF OF THE RENTERS CLASS AND BROKERS FEE CLASS )**

98. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

99. Defendant is willfully maintaining a monopoly in the Relevant Market and abusing its monopoly power through anticompetitive conduct which deprives the online search market, and therefore, pro-consumer, pro-transparency platforms like Zillow and others in violation of the Sherman Act.

100. Defendant has monopoly power in the market for listings of residential properties in the Relevant Market. Defendant is leveraging its access of those listings to engage in predatory and exclusionary conduct which has the purpose and effect of impeding the competitive process and suppressing competition in the online search market.

101. Indeed, beginning in August of 2026, Defendant enacted a strategy to delist its rental unit listings from all publicly available forums, including StreetEasy, in the Relevant Market

to: (1) distort the price of rental units in the Relevant Market, (2) reduce consumer choice and funnel consumers to itself, and (3) to harm competition, including Zillow and others.

102. The choice to boycott Zillow and other publicly available digital listing platforms by refusing to provide them with Defendant's rental unit listings in the Relevant Market has no pro-competitive justification; any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

**<u>THIRD CAUSE OF ACTION</u>**

**VIOLATION OF THE DONNELLY ACT**
**CREATION OF A TRUST**
**(OR, ALTERNATIVELY, ATTEMPTED CREATION OF A TRUST)**
**NEW YORK GEN. BUS. LAW § 340**
**(ON BEHALF OF THE RENTERS CLASS AND BROKERS FEE CLASS )**

103. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

104. Beginning in December 2024 and proceeding through January of 2026, with the acquisition of at least seven real estate firms, Defendant formed a trust in order to control the Relevant Market. The consolidation of these firms allowed Defendant to obtain an 80% market share for rental units in Manhattan alone, as well as the power to dictate and otherwise manipulate the price of rental units.

105. Additionally, beginning in August of 2026, Defendant enacted a strategy to delist its rental unit listings from publicly available forums, including StreetEasy, in the Relevant Market to: (1) distort the price of rental units in the Relevant Market, (2) reduce consumer choice and funnel consumers to itself, and (3) to harm competition, including Zillow and others.

106. The choice to boycott Zillow and other publicly available digital listing platforms by refusing to provide them with Defendant's rental unit listings in the Relevant Market has no

pro-competitive justification; any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

107. The Defendant's conduct is unlawful under a *per se* mode of analysis.

108. In the alternative, the Defendant's conduct is unlawful under either a quick look or rule of reason mode of analysis.

109. As a result of the harm caused, which is explained in detail above, Plaintiff and Class members are entitled to actual and treble damages under the Donnelly Act, as well as reasonable costs and attorneys' fees, pre- and post-judgment interest, and any other relief this Court deems just and proper.

## FOURTH CAUSE OF ACTION

### UNJUST ENRICHMENT
### (ON BEHALF OF THE RENTERS CLASS AND BROKERS FEE CLASS )

110. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

111. As alleged herein, Defendant obtained money and profits that unjustly enriched themselves at the expense of the Plaintiff and Class members, and otherwise obtained financial benefits that they would not have otherwise obtained had they acted in a fair and just manner.

112. Defendant's conduct was wrongful, knowing, and conscious.

113. Plaintiff and Class members suffered injury-in-fact and have lost money as a result of Defendant's unjust conduct in that they paid more for their rental units than its fair value would have allowed in a competitive market. Plaintiff and Class members lack an adequate remedy at law with respect to this claim and are entitled to non-restitutionary disgorgement of financial profits that Defendant obtained as a result of their unjust conduct.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class of all others so similarly situated, respectfully requests judgment against Defendant as follows:

A. The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B. The unlawful monopoly (or attempted monopoly) alleged herein be adjudged and decreed in violation of Section 2 of the Sherman Act and as an unlawful trust in violation of the Donnelly Act;

C. Plaintiff and the Class recover damages and non-restitutionary disgorgement of financial profits to the maximum extent allowed under the applicable laws in favor of Plaintiff and the members of the Class be entered against Defendant in an amount to be trebled to the extent such antitrust laws permit;

D. Plaintiff and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

E. Plaintiff and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law and Plaintiff and the members of the Class have such other and further relief, including injunctive relief, as the case may require and the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: October 23, 2026

Respectfully submitted,

**YAGMAN PLLC**

*/s/ Blake Hunter Yagman*
Blake Hunter Yagman (NY Bar No. 5644166)
The Chrysler Building
405 Lexington Avenue, 26th Floor
New York, New York 10174
Telephone: (929) 709-1493
*blake.yagman@yagmanpllc.com*

Steve W. Berman (*pro hac vice forthcoming*)
Jerrod C. Patterson (NY Bar No. 4110458)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, Washington 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
*steve@hbsslaw.com*
*jerrodp@hbsslaw.com*

David L. Hecht
Lori G. Feldman
**HECHT PARTNERS LLC**
125 Park Avenue, 25th Floor
New York, New York 10017
Tel.: (212) 851-6821

*Attorneys for Plaintiff Lieberman and Proposed Classes*