**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CHARLES LIEBERMAN, on behalf of himself and all others similarly situated,

*Plaintiff*,

v.

COMPASS, INC. D/B/A COMPASS INTERNATIONAL HOLDINGS,

*Defendant*.

Case No. 1:26-cv-07077-MMG

**MEMORANDUM OF LAW IN SUPPORT OF COMPASS, INC.'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....... 1
FACTUAL BACKGROUND ....... 3
I. THE PARTIES ....... 3
II. PLAINTIFF'S CLAIMS ....... 3
III. THE FARE ACT ....... 5
IV. PLAINTIFF'S CLASS DEFINITIONS ....... 5
STANDARD OF REVIEW ....... 6
ARGUMENT ....... 7
I. PLAINTIFF HAS NOT ALLEGED ARTICLE III STANDING ....... 7
II. PLAINTIFF FAILS TO STATE A MONOPOLIZATION CLAIM UNDER SECTION 2 OF THE SHERMAN ACT ....... 9
A. Plaintiff Cannot Plausibly Allege That Compass Has Monopoly Power in the Alleged Product Market ....... 9
1. Compass Cannot Hold Monopoly Power in a Market Where It Does Not Set Pricing ....... 10
2. The Complaint Contains No Well-Pleaded Allegation of Compass's Supposed Dominant Share of the Rental Market ....... 12
3. The Complaint Does Not Address Meaningful Market Characteristics ....... 13
4. The Proposed Geographic Market Is Implausibly Narrow ....... 15
a. Plaintiff Fails to Plead a Relevant Market with the Requisite Geographic Boundaries ....... 15
b. Plaintiff Fails to Properly Apply the Hypothetical Monopolist Test ....... 17
B. Plaintiff Fails to Plausibly Allege That Compass Engaged in Exclusionary or Anticompetitive Conduct ....... 19
C. Plaintiff's Attempted Monopolization Theory Fails for the Same Reasons as Plaintiff's Substantive Monopoly Claim ....... 20
III. PLAINTIFF FAILS TO STATE A MONOPOLY LEVERAGING CLAIM UNDER SECTION 2 OF THE SHERMAN ACT ....... 21
IV. PLAINTIFF LACKS ANTITRUST STANDING ....... 22
V. PLAINTIFF'S STATE LAW CLAIMS SHOULD BE DISMISSED ON JURISDICTIONAL OR SUBSTANTIVE GROUNDS ....... 24

A. The Court Should Not Exercise Supplemental Jurisdiction over Plaintiff's State Law Claims ....................24

B. Plaintiff's Donnelly Act Claim Fails on the Merits ....................25

C. Plaintiff's Unjust Enrichment Claim Fails on the Merits ....................26

1. Plaintiff's Unjust Enrichment Claim Is Duplicative of the Statutory Claims ....................26

2. Plaintiff Does Not Allege He Had Any Relationship with Compass or that Compass Was Unjustly Enriched ....................27

CONCLUSION ....................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adderall XR Antitrust Litig.*,
754 F.3d 128 (2d Cir. 2014) ........................................ 22

*Air Freight Haulage Co. v. Ryd-Air, Inc.*,
1978 WL 1433 (S.D.N.Y. Oct. 10, 1978) ........................................ 17

*In re Aluminum Warehousing Antitrust Litig.*,
2014 WL 4277510 (S.D.N.Y. Aug. 29, 2014) ........................................ 20

*In re Aluminum Warehousing Antitrust Litig.*,
2014 WL 4743425 (S.D.N.Y. Sep. 15, 2014) ........................................ 20, 26

*In re Amaranth Nat. Gas Commodities Litig.*,
587 F. Supp. 2d 513 (S.D.N.Y. 2008) ........................................ 27

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*,
671 F.3d 140 (2d Cir. 2011) ........................................ 6, 7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................ 6, 10

*B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*,
909 F. Supp. 162 (S.D.N.Y. 1995) ........................................ 17

*Balfour-Browne v. Eden Fine Art NY Inc.*,
2026 WL 2607718 (S.D.N.Y. Sep. 3, 2026) ........................................ 26

*Banco San Juan Int'l, Inc. v. Fed. Rsrv. Bank of N.Y.*,
176 F.4th 163 (2d Cir. 2026) ........................................ 8

*Bayer Schering Pharma AG v. Sandoz, Inc.*,
813 F. Supp. 2d 569 (S.D.N.Y. 2011) ........................................ 15, 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................ 6, 13

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*,
142 F. Supp. 2d 296 (E.D.N.Y. 2001) ........................................ 17

*Biocad JSC v. F. Hoffmann-La Roche*,
942 F.3d 88 (2d Cir. 2019) ........................................ 25

*Boyd v. AWB Ltd.*,
544 F. Supp. 2d 236 (S.D.N.Y. 2008)....................24

*Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*,
11 F.4th 55 (2d Cir. 2021)....................16

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)....................13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977)....................23

*In re Canadian Imp. Antitrust Litig.*,
470 F.3d 785 (8th Cir. 2006)....................23

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
996 F.2d 537 (2d Cir. 1993)....................22

*Caplan v. Dollinger*,
803 F. Supp. 3d 219 (S.D.N.Y. 2025)....................28

*Carnegie-Mellon Univ. v. Cohill*,
484 U.S. 343 (1988)....................24

*Cenedella v. Metro. Museum of Art*,
348 F. Supp. 3d 346 (S.D.N.Y. 2018)....................17

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002)....................19

*Chan v. U.S. Dep't of Transp.*,
782 F. Supp. 3d 39 (S.D.N.Y. 2025)....................16

*Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.*,
708 F. App'x 29 (2d Cir. 2017)....................17, 18

*Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*,
166 F. Supp. 2d 891 (S.D.N.Y. 2001)....................15

*In re Commodity Exch., Inc.*,
213 F. Supp. 3d 631 (S.D.N.Y. 2016)....................27

*Concord Assocs., L.P. v. Ent. Props. Tr.*,
817 F.3d 46 (2d Cir. 2016)....................15, 16, 17, 18

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l*,
790 F.3d 411 (2d Cir. 2015)....................6

*DiFolco v. MSNBC Cable L.L.C.*,
622 F.3d 104 (2d Cir. 2010)....................7

*Discon Inc. v. NYNEX Corp.*,
86 F. Supp. 2d 154 (W.D.N.Y. 2000)....................15, 16

*Fu v. Consol. Edison Co. of N.Y., Inc.*,
2018 WL 4373995 (S.D.N.Y. Sep. 13, 2018)....................16

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*,
711 F.3d 68 (2d Cir. 2013)....................23, 25

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
386 F.3d 485 (2d Cir. 2004)....................9

*Heerwagen v. Clear Channel Commc'ns*,
435 F.3d 219 (2d Cir. 2006)....................15

*In re Int. Rate Swaps Antitrust Litig.*,
261 F. Supp. 3d 430 (S.D.N.Y. 2017)....................26

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
62 F.3d 69 (2d Cir. 1995)....................19

*Kardovich v. Pfizer, Inc.*,
97 F. Supp. 3d 131 (E.D.N.Y. 2015)....................7

*Kolari v. New York-Presbyterian Hosp.*,
455 F.3d 118 (2d Cir. 2006)....................24

*Kramer v. Pollock-Krasner Found.*,
890 F. Supp. 250 (S.D.N.Y. 1995)....................26

*Linens of Eur., Inc. v. Best Mfg., Inc.*,
2004 WL 2071689 (S.D.N.Y. Sep. 16, 2004)....................17

*LLM Bar Exam, LLC v. Barbri, Inc.*,
271 F. Supp. 3d 547 (S.D.N.Y. 2017)....................12

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)....................7, 8

*Mathias v. Daily News, L.P.*,
152 F. Supp. 2d 465 (S.D.N.Y. 2001)....................15

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)....................7

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
364 F.3d 1288 (11th Cir. 2004) ....................22

*N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*,
323 F. Supp. 2d 559 (S.D.N.Y. 2004)....................21

*In re Namenda Indirect Purchaser Antitrust Litig.*,
2021 WL 2403727 (S.D.N.Y. June 11, 2021) ....................26

*Norton v. Town of Brookhaven*,
2023 WL 3477123 (2d Cir. May 16, 2023) ....................25

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998)....................19

*Olde Monmouth Stock Transfer Co. v. Depository Tr. & Clearing Corp.*,
485 F. Supp. 2d 387 (S.D.N.Y. 2007)....................11

*P & L Dev., LLC v. Gerber Prods. Co.*,
715 F. Supp. 3d 435 (E.D.N.Y. 2024) ....................17

*PepsiCo, Inc. v. Coca-Cola Co.*,
315 F.3d 101 (2d Cir. 2002)....................9, 12

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
507 F.3d 117 (2d Cir. 2007)....................22

*Snowbridge Advisors LLC v. ESO Cap. Partners UK LLP*,
589 F. Supp. 3d 401 (S.D.N.Y. 2022)....................28

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993)....................20

*Stone v. Eggleston*,
2005 WL 2503853 (E.D.N.Y. Oct. 11, 2005)....................16

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001)....................15

*Tops Mkts., Inc. v. Quality Mkts., Inc.*,
142 F.3d 90 (2d Cir. 1998)....................9, 14

*United States v. Am. Express Co.*,
838 F.3d 179 (2d Cir. 2016)....................18

*United States v. E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956)....................9

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)....................19

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)....................22

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
549 F.3d 100 (2d Cir. 2008)....................7

*X.L.O. Concrete Corp. v. Rivergate Corp.*,
634 N.E.2d 158 (N.Y. 1994)....................25

*Yong Ki Hong v. KBS Am., Inc.*,
951 F. Supp. 2d 402 (E.D.N.Y. 2013)....................26

*In re Zinc Antitrust Litig.*,
155 F. Supp. 3d 337 (S.D.N.Y. 2016)....................9, 10, 11

**Statutes**

28 U.S.C. § 1367(a)....................24

**Other Authorities**

Fed. R. Civ. P. 12(b)(1)....................6

Fed. R. Civ. P. 12(b)(6)....................6

*Fairness in Apartment Rental Expenses (FARE) Act*, NYC Dep't of Consumer & Worker Prot., https://www.nyc.gov/site/dca/about/FAQ-Broker-Fees.page (last visited Nov. 9, 2026)....................5

Jake Indursky & Sheridan Wall, *Compass taps NYC agents to remove listings from StreetEasy*, The Real Deal (updated Aug. 7, 2026), https://therealdeal.com/new-york/2026/08/06/compass-taps-nyc-agents-to-remove-listings-from-streeteasy ....................4, 8

Jake Indursky, *"People will search where the inventory is": Robert Reffkin lays out Compass' portal ambitions,* The Real Deal (Aug. 5, 2026), https://therealdeal.com/national/2026/08/05/compass-ceo-robert-reffkin-lays-out-portal-ambitions....................19

Jonathan Miller, *Housing Notes: Compass' "Fall Marketing Playbook" is a routine antitrust red flag,* The Real Deal (Aug. 10, 2026), https://therealdeal.com/national/2026/08/10/compass-fall-marketing-playbook-is-an-antitrust-red-flag ....................5, 8, 19

## PRELIMINARY STATEMENT

Plaintiff Charles Lieberman does not allege that Compass listed the apartment he rented, collected his broker's fee, or had anything to do with his rental. And yet, Plaintiff seeks to hold Compass liable under federal and state antitrust laws not only for his own alleged "supracompetitive" rent, but also for rising rents across Manhattan. But the supposedly anticompetitive conduct Plaintiff alleges has nothing to do with rental units at all. The alleged "delisting" theory at the heart of the Complaint derives from sources describing Compass's purported marketing strategy for sales units, not rental units. And the allegations concerning Compass's purported "market share" similarly rest on unsubstantiated sales data, not rental data. Plaintiff's theory—that Compass acquired rival brokerages, gained control of the Manhattan rental market, and then "delisted" rental units from public websites like StreetEasy to create a "supply shock" that drove up rents—therefore is baseless. It also rests on a premise the antitrust laws reject: that a broker must market its clients' listings on the platforms of its competitors.

Even assuming that Compass controls the Manhattan rental market (it does not), Plaintiff's other allegations undermine his claims of market power. Plaintiff acknowledges, for example, that the barriers to entry in the brokerage market are low, that lessors can and do lease their units without any broker at all, and that owners and landlords—not brokers—set rental prices. As a matter of law, therefore, a broker does not control rental prices.

Plaintiff theorizes that although Compass does not set rental prices, it nevertheless controls them indirectly by choosing which listings appear on online search platforms. Plaintiff claims that Compass thereby maintains the ability to manipulate supply—and, in turn, dictate prices. But that allegation is implausible, too. Plaintiff specifically alleges that Zillow—not Compass—holds "monopoly power" over the Manhattan online search market. Claiming that another firm holds a

dominant market share necessarily undermines the allegation that Compass possesses monopoly power in that same market.

But even if Compass controlled that market, Plaintiff fails to allege that Compass's purported control or any alleged marketing strategy harmed competition or any consumers of apartments for rent. To the contrary, the data Plaintiff cites shows that the decline in the supply of rental apartments he attributes to Compass began in June 2025—seven months *before* he claims Compass allegedly gained market power, and more than a year *before* Compass's alleged "delisting" of rental units. The same data marks June 2025 as the month the Fairness in Apartment Rental Expenses (FARE) Act took effect, which regulates brokers' fees in New York City. Compass's purported anticompetitive conduct in or around August 2026 therefore could not have caused the preceding June 2025 supply decline, and Plaintiff's own allegations point to an independent legislative cause.

These defects, among others, are fatal to Plaintiff's claims. First, Plaintiff lacks Article III and antitrust standing because his purported injury—the payment of higher rent—is not traceable to Compass's alleged conduct. Second, Plaintiff's monopolization and attempted monopolization claims under Section 2 of the Sherman Act fail because Compass cannot hold monopoly power in a market for rental apartments that it neither owns nor prices. Nor does Plaintiff plead any anticompetitive conduct because his alleged marketing claims are conclusory and unsupported by the very sources he cites, which address sales listings—not rentals. And on top of those deficiencies, Plaintiff fails to justify a geographic market limited to Manhattan—which ignores the economic reality that reasonable substitutes for Manhattan apartments exist in neighboring boroughs and states. Third, Plaintiff's monopoly leveraging claim fails because it rests on unsubstantiated claims about providing rental listings to Zillow and other competing platforms,

with which Compass has no duty to deal. Finally, even if the Court exercises supplemental jurisdiction over Plaintiff's Donnelly Act and unjust enrichment claims, those claims merely duplicate Plaintiff's deficient Sherman Act claims and fail for the same reasons. The Complaint should therefore be dismissed in its entirety with prejudice.

## FACTUAL BACKGROUND

### I. THE PARTIES

Compass is a Delaware corporation headquartered in New York. ECF No. 34, Am. Class Action Compl. ("Compl.") ¶ 25. Compass operates a real estate brokerage business whose agents generally work as independent contractors. *Id.* ¶¶ 26, 43. Compass, as the brokerage, earns commissions from sales and rentals which are then split with agents. *Id.* ¶ 26.

Plaintiff lives in New York. *Id.* ¶ 21. Plaintiff alleges that he searched for a Manhattan apartment on StreetEasy, a Zillow-owned listing platform, in August 2025 and again in August 2026. *Id.* ¶¶ 7, 22. He further alleges that in August 2026, he signed a lease for a two-bedroom apartment on the Lower East Side at $4,000 per month, and that he and his "co-tenant" paid a broker's fee, increasing the "lease price to $4,620." *Id.* ¶ 22. Plaintiff alleges that he later "re-sign[ed] his lease" for $4,850. *Id.* The Complaint does not identify the landlord, the broker, or the listing brokerage, and it does not allege that Compass was involved in Plaintiff's rental. Plaintiff alleges only that he "believes he suffered damages" in the form of "supracompetitive" rent. *Id.* ¶¶ 23–24.

### II. PLAINTIFF'S CLAIMS

The Complaint asserts four counts against Compass: (1) monopolization or attempted monopolization under Section 2 of the Sherman Act based on Compass's acquisitions of other brokerage firms, *id.* ¶¶ 93–97; (2) monopoly leveraging or attempted monopoly leveraging under Section 2 based on Compass's supposed strategy of delisting Manhattan rental units from publicly

available forums, *id.* ¶¶ 98–102; (3) violation of New York's Donnelly Act, N.Y. Gen. Bus. Law § 340, through both Compass's acquisitions and its purported delisting strategy, *id.* ¶¶ 103–09; and (4) unjust enrichment, *id.* ¶¶ 110–13.

Plaintiff challenges two categories of conduct.

First, Plaintiff alleges that Compass "neutralized" its competitors by acquiring other brokerages, thereby gaining monopoly power in the "relevant market." *Id.* ¶¶ 2–3, 54–55. Plaintiff defines the "relevant product market" as the "market for the lease of rental units" in Manhattan. *Id.* ¶ 31. Plaintiff excludes from that market properties for sale and single-family housing. *Id.* ¶¶ 37–38. According to Plaintiff, "based on 2025 data,"[1] Compass has a controlling market share in Manhattan "rental unit listings." *Id.* ¶ 2; *see also id.* ¶¶ 10, 94, 104. Plaintiff's "2025 data," however, appears to derive exclusively from the Indursky & Wall Article, which addresses Compass's supposed sales transaction data. Despite alleging "control" over the lease of Manhattan rental units, Plaintiff does not allege that Compass is a lessor or otherwise controls rental prices. *Id.* ¶ 2. Rather, Plaintiff alleges that Compass "operates an owned-brokerage business" and "earns revenue by collecting a share of the gross sales of real estate commissions that agents earn from home sales and rental agreements executed." *Id.* ¶ 26. Plaintiff further alleges that rental prices are set by "rental community administrators, owners of apartments, and others . . . through various means," including third-party algorithms such as RealPage, price-setting tools on Zillow and StreetEasy, and comparisons to similar units on publicly available platforms. *Id.* ¶ 36.

Second, Plaintiff claims that Compass deliberately "delisted" rental properties from public

[1] *See* Compl. ¶ 2 n.1 (citing Jake Indursky & Sheridan Wall, *Compass taps NYC agents to remove listings from StreetEasy*, The Real Deal (updated Aug. 7, 2026), https://therealdeal.com/new-york/2026/08/06/compass-taps-nyc-agents-to-remove-listings-from-streeteasy) [hereinafter the "Indursky & Wall Article"]).

sources such as StreetEasy, which allegedly drove up rental unit prices, deprived the market of consumer choice, and forced more renters to pay brokers' fees. *Id.* ¶¶ 8–13, 66–69, 77. In support, Plaintiff cites an editorial by Jonathan Miller (the "Miller Editorial"),[2] which purports to analyze the delisting of *sales* units. Plaintiff further alleges that Compass's purported delisting strategy was designed to monopolize the "online search market," *id.* ¶ 4, but concedes that "Zillow (and, therefore StreetEasy) has a dominant market share or monopoly power in the online search market in the geographic area." *Id.* ¶ 29. Plaintiff also acknowledges that, despite alleging Compass "delisted" properties from public sources, all of Compass's listings are shared on the Real Estate Board of New York's (REBNY) Residential Listing Service, which is "visible to all agents of brokerages [] and their clients."[3] *Id.* ¶¶ 8, 50.

## III. THE FARE ACT

Plaintiff's Complaint includes a chart from the Miller Editorial that refers to the FARE Act. *Id.* ¶ 78. The FARE Act prohibits a broker hired by a landlord in New York City from charging broker fees to tenants and requires landlords to disclose all fees that tenants must pay before tenants sign a lease.[4] The FARE Act took effect in June 2025, Compl. ¶ 78, approximately two months before Plaintiff began searching for an apartment, *id.* ¶ 22.

## IV. PLAINTIFF'S CLASS DEFINITIONS

Plaintiff seeks to represent two classes: a renter class and a brokers' fee class. *Id.* ¶¶ 83–84. The "renter class" is defined as "[a]ll persons that rented housing units in the New York City

---

[2] *See* Compl. ¶ 8 n.7 (citing Jonathan Miller, *Housing Notes: Compass' "Fall Marketing Playbook" is a routine antitrust red flag*, The Real Deal (Aug. 10, 2026), https://therealdeal.com/national/2026/08/10/compass-fall-marketing-playbook-is-an-antitrust-red-flag).

[3] Listings are also available on Compass's website.

[4] *See Fairness in Apartment Rental Expenses (FARE) Act*, NYC Dep't of Consumer & Worker Prot., https://www.nyc.gov/site/dca/about/FAQ-Broker-Fees.page (last visited Nov. 9, 2026).

metro area and began their rental agreement at any time during the period of December 1, 2024, until the Defendant's unlawful conduct and its anticompetitive effects cease to persist." *Id.* ¶ 83. This class covers a broader geographic area than Plaintiff's defined relevant market of "Manhattan," *id.* ¶¶ 2, 31, 83, and includes an undefined "metro area." This class does not account for whether a consumer rented a Compass-listed unit, renewed an existing lease, lived in a rent-controlled apartment, or paid a broker's fee.

The brokers' fee class is defined as "[a]ll persons that rented housing units and began their rental agreement at any time during the period of December 1, 2024, and paid a brokers fee either directly or indirectly to Compass (or its affiliates, subsidiaries, and acquisitions) until the Defendant's unlawful conduct and its anticompetitive effects cease to persist." *Id.* ¶ 84. This class has no geographic limit and arguably is nationwide in scope. *Id.*

## **STANDARD OF REVIEW**

### **Fed. R. Civ. P. 12(b)(1)**

A motion to dismiss under Rule 12(b)(1) challenges the Court's "statutory or constitutional power to adjudicate" the plaintiff's claims. *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.a.r.l*, 790 F.3d 411, 416–17 (2d Cir. 2015). The Court must dismiss an action under Rule 12(b)(1) when the plaintiff lacks constitutional standing to bring the case. *Id.* at 417. The plaintiff bears the burden to demonstrate his or her standing to sue. *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).

### **Fed. R. Civ. P. 12(b)(6)**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Strict application of the plausibility standard is particularly critical in antitrust cases, where "[t]he

costs of modern federal antitrust litigation" counsel against sending "defendants into expensive antitrust discovery" based on half-baked allegations. *Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013).

When deciding a motion to dismiss, this Court "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). The Court also may consider an authentic document not expressly incorporated by reference "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Id.* (internal citation omitted). And where any such document "contradict[s]" a "conclusory allegation in the complaint . . . , the document controls and the allegation is not accepted as true." *Kardovich v. Pfizer, Inc.*, 97 F. Supp. 3d 131, 140 (E.D.N.Y. 2015) (quoting *Amidax Trading Grp.*, 671 F.3d at 146–47).

## **ARGUMENT**

### I. PLAINTIFF HAS NOT ALLEGED ARTICLE III STANDING

Plaintiff's claims should be dismissed under Rule 12(b)(1) because he fails to plead the "bedrock" requirement of Article III standing. *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008). To establish standing, a plaintiff must allege "(1) injury-in-fact, which is a concrete and particularized harm to a legally protected interest; (2) causation in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief." *Id.* at 106–07 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)) (internal quotation marks omitted). The Court need not credit allegations contradicted by the Complaint's own exhibits or by documents incorporated by reference. *See Amidax Trading Grp.*, 671 F.3d at 146–47.

Here, Plaintiff cannot show that his injury—higher rent—is "fairly traceable" to Compass. Plaintiff claims that Compass controls the market for Manhattan rental listings and "delisted" units from publicly available platforms, which reduced supply and raised rents. *See* Compl. ¶¶ 2–5. As shown in Part II, those allegations are wrong, as Plaintiff's own sources reflect. But even accepting those allegations as true, the Complaint and the sources it incorporates negate any plausible theory of causation.

*First*, Compass's alleged anticompetitive conduct postdates the purported harm. The Complaint alleges that the decline in Manhattan rental listings that caused the rent spike began in June 2025. *See id.* ¶ 4. According to the Indursky & Wall Article, however, Compass's alleged market share resulted from an acquisition in January 2026, seven months *after* the alleged decline in supply began. *See* Indursky & Wall Article, *supra* note 1; *see also* Compl. ¶ 2 n.2. And according to the Miller Editorial, Compass's alleged "delisting" occurred in mid-2026, more than one year *after* the decline in supply began. *See* Miller Editorial, *supra* note 2; Compl. ¶ 4. Compass therefore could not have caused any supply decline because no plausible causal chain can run backward in time.

*Second*, Plaintiff's own chart identifies an independent cause of the supply decline: the FARE Act. That chart tracks Manhattan median rent and available rental listings from July 2024 to July 2026. Compl. ¶ 4. It shows that in June 2025, when the FARE Act took effect, the supply of rental apartments fell while rental prices continued to increase. *See id.* Plaintiff's own chart thus shows that the supply decline he attributes to Compass began precisely when the FARE Act took effect. Legislation is exactly the kind of independent third-party action that defeats traceability. *See Lujan*, 504 U.S. at 560–61; *see also Banco San Juan Int'l, Inc. v. Fed. Rsrv. Bank*

*of N.Y.*, 176 F.4th 163, 184–85 (2d Cir. 2026) (no Article III standing where "independent decisions" of central bank caused the alleged injury).

Because Plaintiff cannot establish Article III causation, the Complaint should be dismissed under Rule 12(b)(1) for lack of subject matter jurisdiction.

## II. PLAINTIFF FAILS TO STATE A MONOPOLIZATION CLAIM UNDER SECTION 2 OF THE SHERMAN ACT

To state a monopolization claim under Section 2 of the Sherman Act, a plaintiff must plausibly allege that a defendant (1) has monopoly power in a relevant market, and (2) willfully acquired or maintained that power through exclusionary conduct, rather than "a superior product, business acumen, or historic accident." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 377 (S.D.N.Y. 2016). Plaintiff fails to plausibly allege either element.

### A. Plaintiff Cannot Plausibly Allege That Compass Has Monopoly Power in the Alleged Product Market

Monopoly power is "the power to control prices or exclude competition" in the relevant market. *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002). A plaintiff may plead monopoly power either directly or indirectly, by alleging a predominant share of a properly defined market together with other relevant market characteristics—most importantly, barriers to entry. *See PepsiCo*, 315 F.3d at 107–09; *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 97–99 (2d Cir. 1998); *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 500 (2d Cir. 2004). Plaintiff does not (and cannot) plausibly allege that Compass has monopoly power in the market for the lease of rental units.

### 1. Compass Cannot Hold Monopoly Power in a Market Where It Does Not Set Pricing

"It is inherent in the concept of a claim brought under Section 2 that the monopolist has the power over price and competition in the market it purportedly monopolizes." *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d at 379. Here, Plaintiff does not (and cannot) allege that Compass controls pricing in "the market for the lease of rental units." Compl. ¶ 31.

By Plaintiff's own account, it is the owners and managers of rental units who "set rent prices" in response to supply and demand using various third-party "algorithms" and "tools." *Id.* ¶ 36. The Complaint does not allege that Compass owns, manages, or leases a single rental apartment, or that Compass sets rents or controls any of the pricing tools that landlords and owners use. Plaintiff instead alleges that Compass operates a "brokerage business" and earns revenue by collecting a share of its agents' commissions. *Id.* ¶ 26. That is the role of an agent: it markets a unit for the owner, and the owner—not Compass—decides whether to rent the unit and at what price. Indeed, nothing in the Complaint suggests that a lessor who engages a Compass agent gives up the right to set its rent or to lease it directly without a broker. And Plaintiff's allegation that Compass "can literally dictate pricing for as much as 80% of Manhattan's rental units . . . as the listing agent for those properties," *id.* ¶ 61, is precisely the sort of conclusory statement that the Court need not credit and is belied by Plaintiff's own statements and documents. *See Iqbal*, 556 U.S. at 678–79.

*In re Zinc* is instructive. There, purchasers of physical zinc alleged that the defendant warehouse operators had monopoly power in the market for London Metal Exchange ("LME") zinc warehouse services and used that power to manipulate the price of physical zinc. 155 F. Supp. 3d at 379–80. The court dismissed the Section 2 claim because the only price the operator could set in the relevant market was the cost of storage and related services, not the price of physical

zinc. *Id.* at 380. The court further noted that the decision to cancel an LME warrant—the act alleged to have caused the price manipulation—was made by the warrant holder, not the warehouse operator. *Id.* The operator therefore lacked control over the very action alleged to have caused the plaintiffs' injury. *Id.* at 380–81.

The same is true here. Compass, as a broker, cannot control price in a rental market where independent owners set rental prices. *See Olde Monmouth Stock Transfer Co. v. Depository Tr. & Clearing Corp.*, 485 F. Supp. 2d 387, 392 (S.D.N.Y. 2007) (dismissing monopolization claims where defendant did not compete in relevant market for stock transfer agents). And any attempt to recast the relevant market as one for rental *listings*—or the search for rental listings online—also fails. The Complaint uses those formulations interchangeably. *Compare* Compl. ¶ 31 ("the market for the lease of rental units"), *with id.* ¶ 29 ("rental listings" and the "online search market"), *and id.* ¶ 100 ("the market for listings of residential properties"). But Plaintiff's allegations acknowledge that Compass does *not* hold market power in the online rental search market—Zillow does. *See id.* ¶ 29 (alleging that StreetEasy "has a dominant market share . . . in the online search market in the geographic area"); *id.* ¶ 7 (alleging that StreetEasy has "a 70-80% market share in the Relevant Market for the provision of available listings"); *id.* ¶¶ 11, 70 (describing StreetEasy as "the market's dominant portal" and "the platform where New York *buyers* search most") (emphasis added). Plaintiff describes Compass's search platform as merely "a competing product to Zillow/StreetEasy," *id.* ¶ 29, and Plaintiff cites Compass's *aspiration* to one day become "the number one place people search," *id.* ¶ 8—an aspiration that confirms Compass holds no such position today.[5] A plaintiff whose own allegations place the dominant share with another firm

[5] The Complaint's description of Compass's platform confirms that Compass is a small challenger in the rental listing market. Plaintiff relies on a 111% year-over-year increase in daily visitors to Compass's website, Compl. ¶ 8, a rate of growth that shows a platform growing from a small base, not a dominant one.

cannot plausibly allege that the defendant possesses monopoly power. *See LLM Bar Exam, LLC v. Barbri, Inc.*, 271 F. Supp. 3d 547, 584 (S.D.N.Y. 2017), *aff'd*, 922 F.3d 136 (2d Cir. 2019); *PepsiCo*, 315 F.3d at 107–09. Under either version of Plaintiff's product market—the market for rental listings or the search for rental listings online—the monopoly-power element is not met.

### 2. The Complaint Contains No Well-Pleaded Allegation of Compass's Supposed Dominant Share of the Rental Market

Even if Compass could control Manhattan rents, Plaintiff does not (and cannot) plausibly allege that Compass holds a dominant share of the Manhattan rental market—which defeats any claim of monopoly power.

Plaintiff claims that "2025 data" shows that Compass has a dominant share of the Manhattan rental market. Compl. ¶ 2.[6] But the Complaint never identifies that "2025 data." Plaintiff's only support for this allegation is a trade-press article that claims Compass asked agents to remove *sales* listings from StreetEasy. *Id.* ¶ 2 n.1. That article never mentions rental units, renters, landlords, leases, or rent; its references to listings and market share concern only sales.

To the extent Plaintiff cites any data to substantiate Compass's supposed market dominance, that data also concerns home *sales*, not rentals. Plaintiff relies on the "Top 20 NYC Real Estate Transactions in 2025" chart to allege that the combined *gross sales* of the entities in the chart would "exceed $39 billion"—which, according to Plaintiff, is "more than double of the amount of Compass' closest competitor (Douglas Elliman) and more than all of the other competitors listed on the Top 20 combined." *Id.* ¶¶ 56–57. This source says nothing about Manhattan rental leases. Plaintiff also relies on The Capitol Forum chart, which is "based on

[6] The Complaint inconsistently describes the 80% figure as a share of "rental unit listings," *id.* ¶¶ 2, 53, "the listings in Manhattan," *id.* ¶ 10, and "rental units in Manhattan," *id.* ¶¶ 94, 104. These are different metrics.

transaction volume on MLS," *id.* ¶ 58—"a digital database" for "properties *for sale*," *id.* ¶ 34 (emphasis added). And Compass's alleged national scale is likewise measured in *sales*: "250,360 residential real estate transactions in 2025, with a gross transaction value of $237 billion." *Id.* ¶ 26.[7]

Needless to say, it is implausible to claim that Compass's supposed share of the sales market establishes its market power in the rental market. Indeed, the Complaint itself acknowledges that the sales and rental markets are distinct: "Consumers do not consider apartments, condominiums, or houses for purchase as substitutes for rental units because, among other reasons, purchase of real estate requires the ability to make a substantial down payment and to obtain financing." *Id.* ¶ 37. Of course, having defined the market to exclude sales on the (correct) ground that sales are not reasonably interchangeable with rentals, *see Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962), Plaintiff cannot measure Compass's share of the rental market with sales figures. Stripped of the inapplicable sales data, Plaintiff's market share figure is an unsupported conclusion, not a well-pleaded fact. *See Twombly*, 550 U.S. at 555, 570.

**3. The Complaint Does Not Address Meaningful Market Characteristics**

Even a high share of a properly defined market does not establish monopoly power absent barriers to entry and other market characteristics that make the share meaningful. The Second Circuit requires "full consideration of the relationship between market share and other relevant market characteristics," including "the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of

[7] The Complaint also repeatedly blends Manhattan-specific and citywide data. The alleged 40% inventory decline, for example, is measured "across all areas of New York City," Compl. ¶ 12, and the Complaint invokes Brooklyn rent data, *id.* ¶ 79, even though the alleged geographic market is limited to Manhattan, *id.* ¶¶ 1, 31–32. Data from outside the alleged market cannot establish power within it.

consumer demand." *Tops Mkts.*, 142 F.3d at 98. Where entry is easy, even a dominant firm cannot sustain supracompetitive prices, because new or expanding rivals would undercut those prices. *Id.* at 98–99. Here, the Complaint does not allege a single barrier to entry in the residential brokerage business in Manhattan, and the facts Plaintiff does allege suggest that barriers to entry are low.

The Complaint acknowledges that a substantial number of competing brokerages remain active in New York, including Douglas Elliman—Compass's "closest competitor"—and other "Top 20" competitors. Compl. ¶ 57. The Complaint also alleges that some non-Compass brokers that market rental units on StreetEasy "do not charge a brokers' fee," *id.* ¶ 10, and that a property may be "rented out or sold by the owner themselves," without any broker at all, *id.* ¶ 35.

The Complaint further alleges that agents are "independent contractors" who need only "hang their license" with a brokerage to do business, *id.* ¶ 33, which means agents, and the listings they represent, can move between firms. Compass itself was founded in 2012 and grew to its present size within roughly a dozen years, *id.* ¶¶ 42–43, illustrating that entry and expansion are possible. And listing information—including listings designated "Participant's Only"—is shared with every participating broker through REBNY's Residential Listing Service, *id.* ¶ 8, where it remains "visible to all agents of brokerages . . . and their clients," *id.* ¶ 50. In a market where rival brokers can access the same inventory, and agents can change firms by simply moving their license to a competing brokerage, no single brokerage can exclude competition.

The Complaint's allegations concerning Compass's acquisitions, *id.* ¶¶ 3, 43, 54–55, do not fill the gap in Plaintiff's market share theory. Growth by acquisition may show that a firm is large, but size is not monopoly power, and acquisitions say nothing about whether rivals can enter or expand, or whether Compass's agents can raise rents that independent lessors set. Because the

Complaint ignores the market characteristics the Second Circuit requires, it fails to plead monopoly power, even assuming a broker could hold such power in a market for apartment leases.

**4. The Proposed Geographic Market Is Implausibly Narrow**

A plaintiff asserting a Section 2 claim must define a relevant market consisting of both a product market and a geographic market. *Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 52 (2d Cir. 2016) (citing *Bayer Schering Pharma AG v. Sandoz, Inc.*, 813 F. Supp. 2d 569, 574 (S.D.N.Y. 2011)). Dismissal is appropriate where the plaintiff fails to articulate a "plausible explanation as to why a market should be limited in a particular way." *Id.* at 53 (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001)). Here, Plaintiff's alleged geographic market is implausibly narrow.

**a. Plaintiff Fails to Plead a Relevant Market with the Requisite Geographic Boundaries**

A plaintiff must plead the "precise geographic boundaries" of the relevant market. *Id.* at 52–53 (citing *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 480 (S.D.N.Y. 2001)). That market is the "area of effective competition," meaning the area where the seller operates and where consumers can practically turn for the product. *Id.* at 53 (citing *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006), *overruled on other grounds by Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 201 (2d Cir. 2008)). A "relevant market includes all products which are reasonably interchangeable." *Com. Data Servers, Inc. v. Int'l Bus. Machs. Corp.*, 166 F. Supp. 2d 891, 896 (S.D.N.Y. 2001). Relevant markets also "are defined in terms of economic realities, not political divisions." *Discon Inc. v. NYNEX Corp.*, 86 F. Supp. 2d 154, 162 (W.D.N.Y. 2000). The question here is simple: where would renters facing higher Manhattan rents reasonably turn? The answer is obvious, and Plaintiff's geographic market ignores how the New York City area rental market actually works.

The Complaint defines the geographic market as "the borough of Manhattan, New York City, New York," which excludes Brooklyn, Queens, the Bronx, Staten Island, and nearby communities in New Jersey and New York, where renters can and do readily turn. Compl. ¶ 31.[8] Plaintiff offers only two unsupported justifications for those exclusions: (1) residents want to live in "the greatest center of urban life, Manhattan," *id.*; and (2) each municipality "is distinct and has a number of factors which affect the price of living" there, *id.* ¶ 32. Neither supposed justification shows why other locations are not reasonable alternatives. By "arbitrarily excising those alternatives," Plaintiff "undermine[s] the plausibility of [his] antitrust claims." *Concord*, 817 F.3d at 55.

Plaintiff's alleged market is also deficient because it follows a political boundary rather than an economic one. *See Discon*, 86 F. Supp. 2d at 162. The economic reality is that New York City's extensive network of highways, subways, commuter rails, buses, bridges, and tunnels connects Manhattan with the other boroughs, New Jersey, Connecticut, Long Island, and Westchester County. Courts in this Circuit routinely take judicial notice of that network. *See, e.g.*, *Chan v. U.S. Dep't of Transp.*, 782 F. Supp. 3d 39, 74–75 (S.D.N.Y. 2025) (taking judicial notice of the City's "roadways, bridges, tunnels, subways, commuter trains, buses, and bike paths" and finding them generally interchangeable for travel into and out of Manhattan).[9] Because of that

---

[8] Plaintiff's initial Complaint included several of these areas in the geographic market, which acknowledges that they are interchangeable. *See* ECF No. 14, ¶ 30. The operative Complaint drops them without explanation.

[9] *See also Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.*, 11 F.4th 55, 65 (2d Cir. 2021) (taking judicial notice of the City's "extensive and ramified bus system"); *Fu v. Consol. Edison Co. of N.Y., Inc.*, 2018 WL 4373995, at *6 (S.D.N.Y. Sep. 13, 2018) (taking notice of "the fact that there is frequent train service into Manhattan and Brooklyn from New Hyde Park and other, nearby stations"); *Stone v. Eggleston*, 2005 WL 2503853, at *4 (E.D.N.Y. Oct. 11, 2005) (taking judicial notice of a Brooklyn subway station to demonstrate the accessibility of a location in Brooklyn from the plaintiff's Manhattan residence).

network, renters can and do look for apartments across borough and state lines.[10]

Courts routinely dismiss antitrust claims grounded in geographic markets that are "unreasonably and implausibly narrow." *See P & L Dev., LLC v. Gerber Prods. Co.*, 715 F. Supp. 3d 435, 460 (E.D.N.Y. 2024). In *Concord*, for example, the plaintiffs alleged a gaming market limited to the Catskills and a surrounding "catchment area," claiming the region was "unique." 817 F.3d at 53–54. The Second Circuit affirmed dismissal, holding that the excluded destinations, including Atlantic City and Connecticut, were "well-known and accessible to residents in the NY Metro area," and that "[m]erely asserting that a commodity is in some way unique is insufficient to plead a relevant market." *Id.* at 54 (quoting *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 171 (S.D.N.Y. 1995)); *see also Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.*, 708 F. App'x 29, 31 (2d Cir. 2017) (rejecting a single-neighborhood Queens market where the neighborhood was easily reached by subway, rail, bus, and car); *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 361–62 (S.D.N.Y. 2018) (rejecting a New York City art market where the plaintiff's allegations showed alternatives outside New York City).[11] The same result should follow here.

**b. Plaintiff Fails to Properly Apply the Hypothetical Monopolist Test**

Courts test a proposed geographic market with the "hypothetical monopolist test," which

---

[10] Plaintiff seems to recognize as much, as neither of his putative class definitions retain the same geographic boundary as his proposed relevant market. *Compare* Compl. ¶ 31, *with id.* ¶¶ 83, 84.

[11] Courts that have accepted New York City geographic markets have done so for markets spanning several boroughs, not one. *See Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 142 F. Supp. 2d 296, 303 (E.D.N.Y. 2001) (five boroughs), *aff'd*, 35 F. App'x 29 (2d Cir. 2002); *Air Freight Haulage Co. v. Ryd-Air, Inc.*, 1978 WL 1433, at *2 (S.D.N.Y. Oct. 10, 1978) (four boroughs). Even a market broader than Plaintiff's—covering Manhattan, the Bronx, Westchester County, and Putnam County but excluding Brooklyn, Queens, and northern New Jersey—"strain[ed] credulity." *Linens of Eur., Inc. v. Best Mfg., Inc.*, 2004 WL 2071689, at *12 (S.D.N.Y. Sep. 16, 2004). It survived only because the plaintiff pleaded specific facts explaining its local character. *Id.* Plaintiff pleads no such facts here.

Plaintiff invokes here. Compl. ¶¶ 39–41; *see United States v. Am. Express Co.*, 838 F.3d 179, 198 (2d Cir. 2016), *aff'd sub nom. Ohio v. Am. Express Co.*, 585 U.S. 529 (2018). The test asks whether a hypothetical monopolist of the proposed market could profitably impose a "small but significant non-transitory increase in price ('SSNIP')," usually 5%. *Id.* at 199. If enough customers would switch to alternatives to make the increase unprofitable, the market is "likely too narrow and should be expanded." *Id.*

Plaintiff must therefore plead facts showing that a 5% rent increase in Manhattan would not push renters to other boroughs or nearby areas. He does not. Instead, he simply asserts that "the SSNIP test is satisfied, and the market is properly defined," Compl. ¶ 40, because rents have risen more than 5% without enough renters leaving to bring prices down, *id.* ¶ 41. Yet he applies that test to "the *New York* rental market," not to Manhattan. *Id.* (emphasis added).[12] That disconnect alone defeats his allegation.[13] A Manhattan market cannot be validated by price movements across a broader New York market. Indeed, if Plaintiff applied the test to Manhattan alone, it would likely point the other way: a 5% increase would likely drive renters to the readily accessible neighboring areas discussed above. While Plaintiff need not plead an expert SSNIP analysis, he still must plead *some* plausible facts explaining why the other boroughs and surrounding areas are not reasonable substitutes. His failure to do so is fatal to his claims. *See Concord*, 817 F.3d at 54–55.

---

[12] In *Cinema Village Cinemart*, the Second Circuit dismissed a complaint for failure to plead a relevant geographic market where the complaint defined the market as the Forest Hills neighborhood of Queens, but went on to emphasize a larger market, the borough of Queens. 708 F. App'x at 31. Plaintiff does the same here—he alleges a relevant market limited to the borough of Manhattan, but then applies his facts to the New York City rental market as a whole.

[13] Plaintiff takes a similarly inconsistent position with respect to his class allegations. There, Plaintiff defines his "renter class" as renters "in the New York City metro area" and his brokers' fee class without any geographic limitation at all. Compl. ¶¶ 83–84.

### B. Plaintiff Fails to Plausibly Allege That Compass Engaged in Exclusionary or Anticompetitive Conduct

Plaintiff must also plead "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Yet the Complaint offers no well-pleaded allegations of anticompetitive or exclusionary conduct. *See* Compl. ¶¶ 93–97.

Plaintiff alleges that Compass's exclusionary conduct consists of "delisting its properties from publicly available sources" and "relist[ing] them on its own platform to collect monopoly rents." *Id.* ¶ 5. Plaintiff bases those allegations entirely on the Miller Editorial and another article by Jake Indursky. But neither article supports Plaintiff's claims.[14]

Plaintiff cites to one additional article by Indursky for the proposition that Compass delisted units to drive traffic to its own website, resulting in a 111% increase in website traffic.[15] But the cited statistic concerns listings in *Chicago*—not Manhattan. The Miller Editorial (an opinion piece) is cold comfort, as it analyzes the supposed delisting of *sales* units, not rentals. *See* Miller Editorial, *supra* note 2.[16] At bottom, Plaintiff's delisting claims are both conclusory and completely unsupported.

---

[14] The Court may consider both articles, which Plaintiff quotes extensively in the Complaint, and which are "integral" to Plaintiff's allegations. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

[15] *See* Compl. ¶ 8 n.4 (citing Jake Indursky, *"People will search where the inventory is": Robert Reffkin lays out Compass' portal ambitions*, The Real Deal (Aug. 5, 2026), https://therealdeal.com/national/2026/08/05/compass-ceo-robert-reffkin-lays-out-portal-ambitions).

[16] Plaintiff alleges that "Defendant's conduct is unlawful under a *per se* mode of analysis," without further explanation. Compl. ¶ 95. Aside from being conclusory, the assertion fails because the *per se* rule does not apply to Section 2 claims. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (noting that "precedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors," which arise under § 1 of the Sherman Act).

### C. Plaintiff's Attempted Monopolization Theory Fails for the Same Reasons as Plaintiff's Substantive Monopoly Claim

Plaintiff attempts to backstop his faulty Section 2 claims by casually mentioning an attempted monopolization theory. But this alternative theory fares no better than his substantive Section 2 claims. "To state an attempted monopolization claim, a plaintiff must allege plausible facts supporting that the defendant [(1)] has engaged in predatory or anticompetitive conduct, [(2)] with a specific intent to monopolize, and [(3)] a dangerous probability of success." *In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4277510, at *35 (S.D.N.Y. Aug. 29, 2014), *supplemented*, 2014 WL 4743425 (S.D.N.Y. Sep. 15, 2014), *aff'd*, 833 F.3d 151 (2d Cir. 2016). Plaintiff fails to allege any of these elements.

First, as shown above, the Complaint does not plausibly allege predatory or anticompetitive conduct. *See supra* Part II.B.

Second, the Complaint does not even bother to allege that Compass had the specific intent to monopolize the relevant market. Nor could it. The Complaint offers no direct evidence of Compass's supposed intent, and there is no plausible inference of intent to be drawn from Compass's alleged conduct.

Third, the Complaint does not plausibly allege a dangerous probability that Compass will achieve monopoly power in the relevant market. That element turns on the same market-power analysis as the substantive claim, *see Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455–56 (1993), and the Complaint offers nothing beyond the same unsupported and inapposite market share figure. *See supra* Part II.A; *see also Bayer Schering Pharma AG*, 813 F. Supp. 2d at 579–80 (dismissing attempted monopolization claim where the defendant's alleged market share was "contradicted by later assertions" in the operative pleading). The Court should therefore dismiss Plaintiff's attempted monopolization claims.

## III. PLAINTIFF FAILS TO STATE A MONOPOLY LEVERAGING CLAIM UNDER SECTION 2 OF THE SHERMAN ACT

To state a claim for monopoly leveraging, a plaintiff must allege facts showing that the defendant (1) had monopoly power in one market; (2) used that power to gain a competitive advantage in a separate, distinct market; (3) had a "dangerous probability of success" in monopolizing the second market; and (4) caused injury by this anticompetitive conduct. *N.Y. Mercantile Exch., Inc. v. Intercontinental Exch., Inc.*, 323 F. Supp. 2d 559, 572 (S.D.N.Y. 2004).

Plaintiff alleges that Compass used its "monopoly power in the market for listings of residential properties" in Manhattan to gain a competitive advantage in the "online search market." Compl. ¶ 100. But this conclusory allegation does nothing to advance Plaintiff's theory. As explained, Plaintiff cannot plausibly allege that Compass possesses monopoly power in the market for rental listings. Nor can Plaintiff plausibly allege that Compass has a "dangerous probability of success" in monopolizing the distinct online search market for rental listings because Plaintiff's allegations confirm that Zillow has a dominant market share in that market, *id.* ¶ 29, and that Compass is a minor competitor, *id.* ¶¶ 8, 29. And, as explained, the alleged "delisting" does not even pertain to rental listings.

Even if the Court accepts Plaintiff's allegations that Compass has monopoly power in the market for rental listings and delisted rental units from the online search market, the refusal-to-deal doctrine forecloses Plaintiff's monopoly leveraging claim. Plaintiff's monopoly leveraging claim is premised on the theory that Compass "refuse[d] to provide" its rental unit listings to "Zillow and other publicly available digital listing platforms." *Id.* ¶ 102. But it is black letter law that Compass had no obligation to deal with Zillow or any other competitor. *See id.* ¶ 29. The antitrust laws generally do not prevent a firm from exercising its "independent discretion as to

parties with whom [it] will deal." *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004).

The only exception to this principle applies where "a monopolist seeks to terminate a prior (voluntary) course of dealing with a competitor." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 134 (2d Cir. 2014). Plaintiff does not allege that Compass had any prior voluntary relationship with Zillow or any other competitor in the online rental search market, much less a "presumably profitable" one. *See id.* at 135. Indeed, the Complaint acknowledges that Zillow and StreetEasy gather listing data from the third-party MLS, not from Compass. *See* Compl. ¶ 34. This is not the "rare case" where "a refusal to deal amount[s] to a prohibited act of unilateral monopolization." *In re Adderall XR Antitrust Litig.*, 754 F.3d at 135.

Finally, even if Plaintiff's monopoly leveraging claim were not otherwise defective, the Complaint contains no well-pleaded allegations that Compass's conduct harmed *competition*. "[A]nticompetitive conduct is 'conduct without a legitimate business purpose that makes sense only because it eliminates competition.'" *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007) (quoting *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004)). At most, Plaintiff alleges that the purported delisting strategy harmed Zillow (and, by extension, StreetEasy). *See* Compl. ¶ 102. The antitrust laws prevent harm to competition, not harm to "an individual competitor." *See Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993). The monopoly leveraging claim must be dismissed.

## IV. PLAINTIFF LACKS ANTITRUST STANDING

Even if Plaintiff had Article III standing (he does not), Plaintiff still must establish the distinct and more demanding requirement of antitrust standing for both Sherman Act claims. *See Port Dock*, 507 F.3d at 121. "Antitrust standing is a threshold, pleading-stage inquiry and when a

complaint by its terms fails to establish this requirement [the court] must dismiss it as a matter of law." *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 75–76 (2d Cir. 2013).

In the Second Circuit, an antitrust plaintiff must plausibly allege that (1) he suffered an "antitrust injury," and (2) he is an "efficient enforcer" of the antitrust laws. *Id.* at 76. The antitrust injury inquiry requires the Court to compare the "anticompetitive effect of the specific practice at issue" to "the actual injury the plaintiff alleges." *Id.* The plaintiff must show more than a mere causal link. *Id.* Instead, the plaintiff must demonstrate that the harm is "of the type the antitrust laws were intended to prevent and that flows from that which makes . . . defendants' acts unlawful." *Id.*

Plaintiff cannot plausibly allege an antitrust injury for a host of reasons. He attributes his injury—the payment of higher rent—to Compass's alleged market share and "delisting" of rental units, but he fails to plausibly allege either, as discussed above. The Complaint's own allegations also defeat his theory of harm. The supply decline that purportedly caused rents to spike began in June 2025—before the January 2026 acquisition that allegedly gave Compass its alleged dominant market share, and more than a year before the purported delisting. *See* Compl. ¶ 4; *see also id.* ¶ 2 n.2. And Plaintiff's own chart ties the decline to the enactment of the FARE Act. *Id.* ¶ 4. An injury caused by an independent legislative act does not "flow[] from" any allegedly anticompetitive conduct by Compass. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (no antitrust standing where the plaintiffs' injury was caused by the federal government's "statutory and regulatory scheme" and not by the defendants).

Plaintiff's alleged injury is also indirect and speculative. Compass neither owns rental units nor sets their prices. Plaintiff's theory therefore depends on pricing decisions by independent

lessors in a market already shaped by the FARE Act. *See Boyd v. AWB Ltd.*, 544 F. Supp. 2d 236, 251 (S.D.N.Y. 2008) (no antitrust standing where plaintiffs' theory of injury would require "'massive evidence and complicated theories' of causation").

Because Plaintiff alleges neither antitrust injury nor a direct, non-speculative harm, he lacks antitrust standing, and his Sherman Act claims should be dismissed.

## V. PLAINTIFF'S STATE LAW CLAIMS SHOULD BE DISMISSED ON JURISDICTIONAL OR SUBSTANTIVE GROUNDS

If the Court dismisses Plaintiff's deficient federal claims, it should decline to exercise supplemental jurisdiction over Plaintiff's state law claims for unjust enrichment and violation of New York's Donnelly Act. But even if the Court considers the merits, both state law claims fail.

### A. The Court Should Not Exercise Supplemental Jurisdiction over Plaintiff's State Law Claims

Plaintiff's only stated basis for jurisdiction over his two state law claims is supplemental jurisdiction. District courts may exercise supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity,' in deciding whether to exercise jurisdiction." *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "In weighing these factors, the district court is aided by the Supreme Court's additional guidance in *Cohill* that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Id.*

Here, the balance of factors weighs heavily against exercising jurisdiction over Plaintiff's state law claims. *Id.* This case has only just commenced, and no discovery has been conducted.

Accordingly, there is no reason for this Court to retain jurisdiction over the state law claims if it dismisses the federal claims. To do so would be an abuse of discretion. *See Norton v. Town of Brookhaven*, 2023 WL 3477123, at *4–5 (2d Cir. May 16, 2023) (finding court "abused its discretion in retaining supplemental jurisdiction" over state law claims after federal claims were dismissed).

### B. Plaintiff's Donnelly Act Claim Fails on the Merits

Plaintiff's Donnelly Act claim is a near-verbatim copy of his Sherman Act claims and fails for the same reasons.

"The New York Court of Appeals has held that the Donnelly Act, which was modeled on the Sherman Act, 'should generally be construed in light of [f]ederal precedent and given a different interpretation only where [s]tate policy, differences in the statutory language or the legislative history justify such a result.'" *Gatt*, 711 F.3d at 81–82 (quoting *X.L.O. Concrete Corp. v. Rivergate Corp.*, 634 N.E.2d 158, 161 (N.Y. 1994)) (affirming dismissal of Donnelly Act claim for the same lack of antitrust standing that defeated the Sherman Act claim). Accordingly, courts in this Circuit routinely dismiss Donnelly Act claims that rest on the same allegations as deficient Sherman Act claims. *See id.*; *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 101 (2d Cir. 2019) ("As [plaintiff] has not stated a plausible claim for relief under the Sherman Act, its Donnelly Act claim similarly fails.").

Plaintiff's Donnelly Act claim rests on the same flawed and conclusory factual allegations as his Sherman Act claim: the same acquisitions, the same alleged share of Manhattan rental listings, Compl. ¶¶ 94, 104, the same alleged marketing "delisting" strategy, and the same alleged "boycott" of listing platforms, *id.* ¶¶ 101, 102, 105, 106. Plaintiff asserts no facts specific to New York law. As discussed in Part II, *supra*, Plaintiff fails to appropriately define a relevant product or geographic market, let alone plausibly allege that Compass has monopoly power in that market

or engaged in anticompetitive or exclusionary conduct. Thus, Plaintiff's Donnelly Act claim fails for the same reasons as his Sherman Act claims.

### C. Plaintiff's Unjust Enrichment Claim Fails on the Merits

To state a claim for unjust enrichment under New York law, a plaintiff must allege that "(1) [the] defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 500 (S.D.N.Y. 2017).

#### 1. Plaintiff's Unjust Enrichment Claim Is Duplicative of the Statutory Claims

Unjust enrichment "is an equitable claim that is unavailable where an adequate remedy at law exists." *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 2403727, at *38 (S.D.N.Y. June 11, 2021). Where an "adequate remedy exists under the New York antitrust statutes"—and where the unjust enrichment claim "simply 'duplicates the antitrust claims'"—the unjust enrichment claim cannot survive. *Id.*; *see also Balfour-Browne v. Eden Fine Art NY Inc.*, 2026 WL 2607718, at *5 (S.D.N.Y. Sep. 3, 2026) (Garnett, J.) (dismissing duplicative unjust enrichment claim that relied on "the same factual allegations and the same theory of liability" as other claims in the complaint). Further, when a plaintiff lacks antitrust standing, he cannot bring "identical claims under a common law theory of unjust enrichment." *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 425 (E.D.N.Y. 2013). Allowing such a claim would "disintegrate" the "entire thrust and purpose of the antitrust standing doctrine." *Id.*

Should the Court dismiss Plaintiff's federal or state law claims, it must also dismiss the unjust enrichment claim because it is predicated on alleged antitrust violations. *See In re Aluminum Warehousing Antitrust Litig.*, 2014 WL 4743425, at *4; *see also Kramer v. Pollock-Krasner Found.*, 890 F. Supp. 250, 257 (S.D.N.Y. 1995) (dismissing unjust enrichment claim that

"hinge[d] on . . . practices claimed by plaintiff to be illegal," where "the allegations of illegality in the complaint fail").

**2. Plaintiff Does Not Allege He Had Any Relationship with Compass or that Compass Was Unjustly Enriched**

Plaintiff's unjust enrichment claim also fails because Plaintiff does not plausibly allege that he had any relevant relationship with Compass or that Compass was unjustly enriched as a result of its purported market manipulation.

"While the plaintiff 'need not be in privity with the defendant to state a claim for unjust enrichment,' neither can the relationship between the parties be 'too attenuated to support such a claim.'" *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 676 (S.D.N.Y. 2016). Here, Plaintiff does not allege that he or any member of the renter class had any relationship with Compass. Instead, Plaintiff claims that Compass was unjustly enriched by *any* rentals because Compass's alleged "unjust conduct" caused Plaintiff and class members to "pa[y] more for their rental units than [their] fair value would have allowed in a competitive market." Compl. ¶ 113. But a plaintiff cannot plead unjust enrichment with a conclusory allegation that his "losses were caused by defendant['s] market manipulations" without alleging "any direct relationship" with the defendant. *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 547 (S.D.N.Y. 2008), *aff'd*, 730 F.3d 170 (2d Cir. 2013). Such allegations are "too attenuated to support an unjust enrichment claim." *Id.*; *see also In re Commodity Exch., Inc.*, 213 F. Supp. 3d at 677 (holding that when plaintiffs, like here, fail "to allege that they had any relevant relationship with the Defendants . . . , the [Complaint] fails to state a claim for unjust enrichment").

Plaintiff also fails to allege that Compass was unjustly enriched by the payment of any broker's fees. As noted above, neither Plaintiff nor any member of the renter class is alleged to have paid a broker's fee to Compass. And even as to the broker's fee class, Plaintiff does not

contend that the payment of *any* brokers' fees to Compass was unjust. Plaintiff claims only that renters should not have to "pay brokers fees to Compass and only Compass." Compl. ¶ 68. This broad allegation lacks the specificity needed to survive a motion to dismiss. *See Caplan v. Dollinger*, 803 F. Supp. 3d 219, 238 (S.D.N.Y. 2025) ("Plaintiffs' '[f]ailure to plead facts identifying with any specificity the benefit' each of these Defendants 'is alleged to have received is fatal' to their unjust enrichment claims."); *Snowbridge Advisors LLC v. ESO Cap. Partners UK LLP*, 589 F. Supp. 3d 401, 421 (S.D.N.Y. 2022) (to state a claim for unjust enrichment, the alleged benefit to the defendant "must be both 'specific' and 'direct'"). Plaintiff's unjust enrichment claim must therefore be dismissed.

## CONCLUSION

For the reasons set forth herein, Compass respectfully requests that the Court dismiss the Complaint with prejudice and grant any further relief the Court deems just and proper.

Dated: New York, New York
November 10, 2026

KELLEY DRYE & WARREN LLP

By: */s/ Sean M. Farrell*

Sean M. Farrell
Geoffrey W. Castello
Genna S. Steinberg

3 World Trade Center
175 Greenwich Street
New York, New York 10007
Telephone: 212-808-7800
Facsimile: 212-808-7897
sefarrell@kelleydrye.com
gcastello@kelleydrye.com
gsteinberg@kelleydrye.com

*Attorneys for Compass, Inc.*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing Memorandum of Law in Support of Compass, Inc.'s Motion to Dismiss contains 9,040 words in accordance with the Court's Order, ECF No. 36, and otherwise complies in all respects with the requirements set forth in Section II.B.2 of the Court's Individual Rules.

By: */s/ Sean M. Farrell*
Sean M. Farrell